## CICARDI BROTHERS FRUIT & PRODUCE COMPANY, a Corporation, Respondent, v. PENNSYLVANIA COMPANY, a Corporation, Appellant.

St. Louis Court of Appeals. Opinion Filed May 6, 1919.

1. **CARRIERS:** Carriers of Freight: Breach of Agreement to Reconsign: Petition: Sufficiency. In an action to recover damages because of the failure of the defendant to carry out an agreement to reconsign by wire a shipment of potatoes, petition *held* to allege a definite breach of an oral special agreement on the part of defendant to immediately divert or reconsign such shipment by wire on a given date.

2. ————: ————: Interstate Commerce Act: Effect of Published Tariff. Under the federal Interstate Commerce Act as amended by the Elkins Act, 32 Stat. at Large, N. 847, c. 708 (U. S. Comp. Stat. Section 8597), a published tariff, so long as it is in force, has the effect of a statute and is binding alike on carrier and shipper.

3. ————: ————: ————: Regulations: Effect. With respect to services governed by the federal Interstate Commerce Act as amended by the Elkins Act, the rule that both carrier and shipper are bound by and cannot alter the terms of service as fixed by the filed regulations applied, not only to rates, but also to other stipulations relating to service and facilities within the purview of the act.

201 M. A.—39

4. **COURTS: Interstate Shipments: State Courts Bound to Follow Decisions of Federal Courts.** The effect to be given the provisions of an interstate shipping contract is governed by the decisions of the federal courts, and State courts are bound to follow their rules.

5. **CARRIERS: Interstate Commerce Act: Filed Tariff Rates Conclusive.** Under the federal laws, the shipper is bound to take notice of the filed tariff rates, and, so long as they remain operative, they are conclusive as to the rights of the parties, in the absence of facts or circumstances showing an attempt 'at rebating or false billing.

6. ————: ————: **Effect of Schedules: Contracts in Violation.** No oral agreement can be given a prevailing effect which will be contrary to the filed schedule in that to do so would open the door to special contracts and defeat the primary purposes of the Interstate Commerce Act, which requires equal terms to all shippers and the charging to all of but one rate and that the rate filed, as required by the act.

7. ————: ————: **Discrimination: Special Agreements to Divert or Reconsign: Prohibited by Interstate Commerce Act.** *Held*, plaintiff cannot enforce a special agreement by which the carrier guaranteed to cause plaintiff's cars to be immediately diverted by wire so that they would leave Pittsburgh, Pa., by the evening train and arrive in Chicago, Ill., at a particular time, such special agreement being tantamount to an agreement (if made) on the part of the carrier to guarantee a particular connection and transportation by a particular train, so as to give an advantage or preference not open to all and not provided for in the published tariffs, and prohibited by the Interstate Commerce Act as amended by the Elkins Act.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Thomas C. Hennings*, Judge.

REVERSED AND REMANDED.

*Fordyce, Holliday & White* for appellant..

(1) The special oral agreement alleged in plaintiff's petition "immediately divert or reconsign by wire" on July 11, 1914, is void as a violation of the Interstate Commerce Act. C. & A. v. Kirby, 225 U. S. 155, 56 L. Ed. 1033. (2) A shipper cannot recover damages for the breach of the carrier's special agreement for the

interstate shipment of freight where no provision is made for such special agreement in the tariffs and regulations on file with the Interstate Commerce Commission. C. & A. v. Kirby, 225 U. S. 155, 56 L. Ed. 1033. (3) The carrier and the shipper can make no alteration of the terms upon which the goods are held under a tariff or published regulation. So. Ry. Co. v. Prescott, 240 U. S. 632, 60 L. Ed. 836, 839; Western Transit Co. v. Leslie, 22 U. S. 448, 61 L. Ed. 423, 427. (4) The tariffs and regulations containing bills of lading and the rules for movement of freight, on file with the Interstate Commerce Commission, are to be treated as statutes of the United States and are binding on the shipper and carrier alike. P. R. R. Co. v. International Milling Co., 230 U. S. 184, 57 L. Ed. 1446, 1451. (5) To allow recovery on the special contract pleaded and proved in this case would permit the carrier to give an advantage or preference to the plaintiff not open to all and not provided in the published tariffs, and would open the door to all manner of special contracts, departing from the schedules and rates filed with the Interstate Commerce Commission and defeat the primary purposes of the Interstate Commerce Act. C. & A. v. Kirby, 225 U. S. 155, 56 L. Ed. 1033; A. T. & S. F. Ry. Co. v. Robinson, 233 U. S. 173, 58 L. Ed. 901, 905; Ingwerson v. Railroad Co., 205 Mo. 328. (6) Contracts between the shippers and carriers for the interstate movement of freight are governed by Federal law. Adams Express Co. v. Croninger, 226 U. S. 491, 57 L. Ed. 314; C. C. C. & St. L. R. R. v. Dettleback, 239 U. S. 588, 60 L. Ed. 453; Southern Ry. Co. v. Prescott, 240 U. S. 632, 60 L. Ed. 836, 839; Western Transit Co. v. Leslie, 242 U. S. 448, 61 L. Ed. 423; C. N. O. & T. P. Ry. Co. v. Rankin, 241 U. S. 319, 60 L. Ed. 1022; McFall v. Ry. Co., 185 S. W. 1145 (Mo. App.). (7) The parties cannot waive the terms of the contract under which the shipment was made pursuant to the Federal Act, nor can the carrier by its conduct give the shipper

the right to ignore these terms which were applicable to that contract and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed. Ga. Ry. Co. v. Blish, 241 U. S. 190, 60 L. Ed. 948. (8) As respects interstate shipments, state courts are, of course, bound to enforce the rule stated in the Blish case that the agreements made under the published tariffs and regulations cannot be modified or waived by the carrier or shipper. McFall v. Railroad Co., 185 S. W. 1157 (Mo. App.); Thompson v. Railroad Co., 185 S. W. 1145 (Mo. App.). (9) Plaintiff must recover on the contract pleaded in its petition, for plaintiff cannot plead one cause of action in his petition and recover on another. Ingwerson v. Railroad, 205 Mo. 528; Cudahy Co. v. Railway Co., 196 S. W. 406 (K. C. Ct. of App.). (10) The defendant, Pennsylvania Company, is not liable for any delay in carrying out reconsignment or diversion orders for the three cars in the Pittsburgh Produce Yards, for plaintiff's own evidence shows that they were on July 11th to 14th in the exclusive possession of the Pennsylvania Railroad Company and not in the possession of the Pennsylvania Company. The responsibility peculiar to a common carrier is not devolved on the next connecting carrier until the receiving carrier has delivered the goods to the former with directions for shipment giving the place of destination and to whom consigned. Until this is done the relation of common carrier is not established between the shipper and the connecting carrier. Bosworth v. Railway Co., 87 Fed. (C. C. A.) 72, 81, 82 (reversed on other matters), 179 U. S. 442, 45 L. Ed. 267; Texas & Pac. Ry. Co. v. Reiss, 183 U. S. 621, 46 L. Ed. 358. Otrick v. Ry. Co., 154 Mo. App. 420, 432; So. Ry. Co. v. Renes, 192 Ala. 620; Palmer v. Railroad, 56 Conn. 137; Railroad v. Washburn, 22 Ohio State, 324; Railroad v. McFadden, 154 U. S. 155, 38

L. Ed. 944. (11) The bill of lading issued by the initial carrier governs the entire transportation and fixes the obligations of all connecting carriers. Ga. Ry. Co. v. Blish Co., 241 U. S. 190, 60 L. Ed. 9.18; Adams Express Co. v. Croninger, 226 U. S. 491, 57 L. Ed. 314; C. C. C. & St. L. v. Dettleback, 239 U. S. 588, 60 L. Ed. 453. (12) The Carmack Amendment makes the initial carrier liable for the acts of all connecting carriers in case of delay by a connecting carrier, but a connecting carrier is not liable for acts of the initial carrier. With the exception of the initial carrier, the rule is that only the carrier on. whose line the act was done that created the loss, is liable. Exposition Mills v. Railroad Co., 83 Ga. 441; Otrick v. St. L., I. M. & S. Ry. Co., 154 Mo. App. 420, 432; Hudson v. Railway Co., 226 Fed. 38, 43; Railway Co. v. Brewing, 96 Tenn. (12 Pickle) 677. (13) The freight bills offered in evidence by plaintiff show that the Pennsylvania Company advanced to the preceding carrier $3 for reconsignment charges at Pittsburgh. The reconsignment was, therefore, according to plaintiff's own evidence, undertaken by the Pennsylvania Railroad Company in whose possession the cars were on July 11th to 14th, and was not undertaken by the Pennsylvania Company, defendant in this case, and hence the defendant is not liable. Bosworth v. Railway Co., 87 Fed. (C. C. A.) 72, 81, 82; Texas & Pac. Ry. Co. v. Reiss, 183 U. S. 621, 46 L. Ed. 358; Otrick v. Railway Co., 154 Mo. App. 420, 432; So. Ry. Co. v. Renes, 192 Ala. 620; Palmer v. Railroad, 56 Conn. 137; Railroad v. Washburn, 22 Ohio State, 324; Mo. Pac. R. R. v. McFadden, 154 U. S. 155, 38 L. Ed. 944. (14) The Vandalia Railroad Company was the agent of the Pennsylvania Railroad Company or Cicardi Bros. to transmit diversion or reconsignment orders to the Pennsylvania Railroad Company for Cicardi Bros., and Cicardi Bros. knew at the time they furnished the diversion or reconsignment orders that the cars were in the Pittsburgh Produce Yards on the tracks of the Pennsylvania Railroad Company; therefore, any

breach of contract in the transmission of such orders or putting the orders into effect (conceding, for the sake of argument, there was a valid agreemtnt), was the liability of the Pennsylvania Railroad Company or Cicardi Bros., and not that of the Pennsylvania Company, for the Pennsylvania Company did not have possession of the cars until the orders were put into effect and the cars were actually delivered to the Pennsylvania Company by the Pennsylvania Railroad Company, and this was on July 14, 1914. Bosworth v. Railway Co., 87 Fed. (C. C. A.) 72, 81, 82; Exposition Mills v. Railroad Co., 83 Ga. 441; Gass v. Railroad Co., 91 Mass. 220; Darling v. Railroad Co., 11 Allen (Mass.) 295; Miller v. Railroad Co., 83 Tex. 518. (15) Where an arrangement is made between several connecting carriers by which goods to be carried over the entire route are to be delivered by each carrier to the next succeeding carrier, each carrier to pay the preceding carrier the amount of its charges, and the last one to collect the whole amount from the consignee, the receiving of the goods by the last carrier and the payment of the entire charge by the consignee will not render the last carrier liable for any injury done to the goods before they are received by it. Gass v. Railroad Co., 99 Mass. 220; Darling v. Railroad Co., 11 Allen (Mass.) 295; Miller v. Railroad Co., 83 Texas, 518. (16) It is admitted by the plaintiff that there was no delay in transporting the cars by the Pennsylvania Company from Pittsburgh to Chicago after the Pennsylvania Company secured possession of the cars, and that the Court so instructed the jury. Defendant Pennsylvania Company is, therefore, not liable. (See defendant's instruction No. 9, Rec., p. 177). Bosworth v. Railway Co., 87 Fed. (C. C. A.) 72; Gass v. Railroad Co., 99 Mass. 220; Darling v. Railroad Co., 11 Allen (Mass.) 295; Miller v. Railroad Co., 83 Texas, 518. (17) The Pennsylvania Company is not liable for failure of the plaintiff to furnish diversion or reconsignment orders to Mr. Rush, as Mr. Rush (agent of the Pennsylvania Railroad Com-

pany in charge of the produce yards at Pittsburgh) had requested in his telegram to Cicardi Bros. on July 11th. Had plaintiff furnished disposition as requested to the Pennsylvania Railroad Company and the Pennsylvania Railroad Company had delivered the goods to the Pennsylvania Company on July 11th, the responsibility of the Pennsylvania Company would have begun on July 11th; but since the fact that the Pennsylvania Company did not get the goods on July 11th was due to plaintiff's own fault in not replying to the Pennsylvania Railroad Company's agent's telegram for disposition, the Pennsylvania Company, of course, is relieved of any responsibility. Bosworth v. Railway Co., 87 Fed. (C. C. A.) 72; Gass v. Railroad Co., 99 Mass. 220; Darling v. Railroad Co., 11 Allen (Mass.) 295; Miller v. Railroad Co., 83 Texas, 518. (18) The certificate of the Secretary of the Interstate Commerce Commission to the tariffs on file with the Commission is the best evidence, and it was error of the trial court to admit the oral testimony of plaintiff's witnesses Thompson and Stewart as to what the tariffs contained in regard to reconsignments and diversions. 4 Fed. Stat. Ann. (2 Ed.) 488; Hanish v. U. S., 227 Fed. 584 (C. C. A. of 8th Cir.). (19) The evidence admitted by the court to the effect that the tracks of the Pennsylvania Railroad Company and the Pennsylvania Company were not marked with identification marks, is clearly immaterial and prejudicial as it led the jury to believe this was material to the issue as to who had possession of the cars as between the Pennsylvania Company and the Pennsylvania Railroad Company on July 11, 1914. The real question was not whether a person walking along tracks could distinguish one track from another, but whether the produce yards were owned and operated by the Pennsylvania Railroad Company and not the Pennsylvania Company, and the uncontradicted evidence of plaintiff and defendant was that the Pittsburgh Produce Yards were on the tracks of, and were owned and controlled by, the Pennsylvania Railroad

Company and not the Pennsylvania Company. Bosworth v. Railroad, 87 Fed. (C. C. A.) 72, 81, 82; So. Ry. Co. v. Renes, 192 Ala. 620; Mo. Pac. v. McFadden, 154 U. S. 555, 38 L. Ed. 944; Palmer v. Railroad, 56 Conn. 137; Railroad v. Washburn, 22 Ohio, 324; Otrick v. Railroad, 154 Mo. App. 420, 432.

*Frank A. Thompson* for respondent.

(1) It is the duty of a railroad company having goods in its possession to divert or reconsign them in accordance with the instructions of the rightful owner thereof. 10 Corpus Juris., 84; Lord & Bushnell Co. v. Railroad, 155 Mo. App. 175; Carder v. Railroad, 170 Mo. App. 698, 705. (2) In an action for failure to divert or reconsign in accordance with directions, the action can be either *ex contractu* or *ex delicto*. Lord & Bushnell v. Railroad, 155 Mo. App. 175; Trout v. Livery & Undertaking Co., 148 Mo. App. 624. (3) Here the substance of the cause of action is the negligent breach of the contractual undertaking by the defendant, which received and accepted the diverting orders and stated or agred that the order would be wired immediately. The failure to so wire under these circumstances was a breach of duty owed by defendant as a common carrier. (4) The failure to wire the instructions to reconsign was negligence as a matter of law, growing out of the relation of the shipper and carrier. (5) The petition expressly states that defendant failed and neglected to divert or reconsign said cars, in violation of its duty as a common carrier. Trout v. Livery & Undertaking Co., 148 Mo. App. 624. (6) Defendant's agent received and accepted the reconsignment orders for the cars in Pittsburgh. He undertook to divert them by wire and for the service charged $3, and failure to divert by wire caused the damage. The action can be considered as an action on the contract, a sort of an additional contract, for which the consideration is $3, or an action for negligence growing out of the breach of a contract.

In one case it would be called *ex delicto* and in the other case *ex contractu*, and under our administration of law it makes no difference what you call the cause of action. Trout v. Livery & Undertaking Co., 148 Mo. App. 624. (7) When the diversion orders were given, it was known that there would be a new charge for them. There was, therefore, a sort of an additional. or new agreement, supported by an additional consideration, which consideration was mentioned in the tariff which was originally displayed to counsel for the plaintiff, as testified to, and the consideration was collected and retained by defendant. (8) There was evidence that at the time the reconsignment orders were given the cars were in the Pittsburgh Produce Yards, held there by the defendant company awaiting reconsignment orders. The waybill conclusively shows this fact. (9) A carrier cannot contract against its own negligence. Boston & Main R. R. Co. v. Piper, 246 U. S. 439; 10 Corpus Juris., sec. 195; McFadden v. Railroad, 92 Mo. 343; Ball v. Railway Co., 83 Mo. 574; Clark v. Railroad, 64 Mo. 440; Griffin v. Railroad, 115 Mo. App. 549; Geo. M. Pierce Co. v. Wells Fargo & Co., 236 U. S. 278. (10) The defendant is not in position to complain of the court's action in giving plaintiff's instruction on the measure of damages, nor it is in position to complain of any action of the court in refusing any instructions offered by the defendant for the reason that said matters were not properly preserved in the motion for a new trial. Probst. et al. v. St. Louis Basket & Box Co., 207 S. W. 891; Kansas City Disinfecting & Mfg. Co. v. Bates County, 273 Mo. 300; Lampe v. United Railways Co., 202 S. W. 438; Nitchman v. United Railways Co., 203 S. W. 491; Wampler v. Railroad, 269 Mo. 464; Kansas City D. & M. Co. v. Bates County, 201 S. W. 92. (11) The so-called tariff introduced by defendant, found on pages 162-A-164, inclusive, does not show anywhere that the Pennsylvania Company was a party to the tariff, and there is nothing from

which any such inference can be drawn. It therefore cannot take any advantage of the terms of the tariff.

BECKER, J.—This is a suit by plaintiff to recover damages from defendant because of the failure of the defendant to carry out an alleged agreement on its part to immediately reconsign by wire three cars of potatoes from Pittsburgh, Pennsylvania to Chicago, Illinois.

Plaintiff had three car loads of potatoes in transit from Cape Charles, Virginia to St. Louis. On July 11, 1914, and for a day or two prior thereto they were being held in the produce yards at Pittsburgh, Pennsylvania, awaiting diverting or reconsigning orders. According to plaintiff's testimony, at about ten thirty o'clock on Saturday morning of the said 11th day of July, plaintiff phoned the Vandalia Railroad office in St. Louis, agent for the defendant carrier, that plaintiff desired to have three cars of potatoes diverted over its lines from Pittsburgh to Chicago, and the Vandalia representative who took the message over the phone stated that he would immediately wire the diverting of the cars as requested, and plaintiff thereupon immediately caused a messenger to go to the bank and take up the drafts to which the bills-of-lading for these cars were attached and caused them to be taken to the office of the Vandalia Railroad Company, and the receipt taken for the same, signed by the Vandalia Railroad Company. Plaintiff's testimony is to the effect that the bills-of-lading were delivered at or about a quarter of eleven in the forenoon; that after such delivery of the bills-of-lading, the cashier of the plaintiff called up the Vandalia over the telephone and had a talk with a Mr. Bula, Commercial Agent in the Vandalia office, during the course of which Bula stated that he would see to it that the order for diverting the cars was sent immediately by wire. It further appears that the cars were in the produce yards at Pittsburgh, a fact which was known to the plaintiff, plaintiff having re-

ceived a wire from Mr. Rush, the official in charge of said yards where said cars were held, asking what disposition the plaintiff desired to make of the cars. This information, that the cars were in the produce yards at Pittsburgh, was not disclosed to the Vandalia at the time the order for diverting the cars was made.

On the part of the defendant testimony was adduced tending to show that the plaintiff communicated with the Vandalia in St. Louis by telephone at eleven thirty on Saturday morning, July 11, 1914; that plaintiff stated that it had three cars to be reconsigned from Pittsburgh and that it would send a boy down directly with the bills-of-lading and a reconsigning order; that the cars were to be reconsigned to Baldwin & Company at Chicago; that the Vandalia representative replied it was rather late and that their Pittsburgh office was closed and they would not be able to wire the order diverting the cars, and that they would send the diverting order by mail that afternoon. According to testimony adduced by defendant, it did not know whether the cars were in Pittsburgh at that time, nor did the plaintiff inform it as to their location; also that the Pittsburgh office of the defendant closes at twelve o'clock noon on Saturday, which is equivalent to eleven o'clock in St. Louis.

Mr. Bula, Freight Solicitor for the Vandalia, who had one of the conversations over the telephone with the representative of the plaintiff relative to the reconsigning of these cars, testified for the defendant. In his testimony we find the following questions and answers: "Q. In the matter of reconsigning orders, diversion orders, they are covered by public tariffs? A. Yes. Q. On file in the Interstate Commerce Commission? A. Yes, sir. Q. All those terms under which the reconsignment and diversions are carried out, are all covered by tariffs? A. Yes, sir. Q. Did Miss Hansen (cashier for plaintiff company) tender you any changes for telegraph or phone service? A. No. Q. In connection with these reconsigning orders? A.

No. Q. Do you make any reconsignments without possession of the original bills-of-lading? A. No. Q. You cannot act on phone call? A. No. Q. When did you send this letter to Pittsburgh? A. Twelve o'clock Saturday. Q. To whom did you address it? A. Mitchell, freight solicitor, Pittsburgh, Vandalia Railroad. Q. Is that the usual course of business of your company? A. Yes, sir. . . . Q. If you had sent a telegram to Mitchell Saturday afternoon, July 11th, would it have done any good? A. No. Q. Was there anybody there to receive it? A. No, those offices are closed just like the general office. Q. Any man in charge of the office that afternoon? A. No. Q. And you say a letter would have gotten there in the same length of time? A. Just exactly." Bula also testified that the produce yards in which these particular cars were, were in charge of an official named Rush, an employee of the Pennsylvania Railroad Company, a separate and distinct company from the defendant; that Rush had a separate office apart from that of the officials of the Pennsylvania Company, defendant here, located up town in the produce yards in Pittsburgh; that had the plaintiff given defendant the information that the cars were being held in the produce yards in Pittsburgh they could have wired the order to divert the cars to Mr. Rush on Saturday afternoon.

Samuel G. Hopkins, an employee in the commercial office of the Vandalia office in St. Louis, testified as a witness for the defendant and corroborated the testimony of the witness Bula to the effect that plaintiff asked for the diverting of the cars on the morning in question at an hour too late for them to reach the defendant's office in Pittsburgh by wire; that diverting orders were sent by mail during the day Saturday, which would reach their office in Pittsburgh for delivery as early as if a telegram had been sent when plaintiff sent in the bills-of-lading with the order to divert the cars; that they did not know of the particular location of the cars in Pittsburgh, but had they known of the

same they could have reached the produce yards by wire over the Western Union Telegraph lines. The following questions and answers appear in his testimony: "Q. What is the course of business between your office and Pittsburgh on Saturday afternoon with reference to reconsignment or diversion orders? A. They are handled by mail. Q. Invariably? S. Yes, unless we know the actual location of the cars. Q. Then what is your custom? A. We use the Western Union Telegraph. Q. Could you have the Western Union Telegraph—could you take that course with Mr. Mitchell's office on Saturday afternoon? A. No. Q. With what office would you take it up? A. The local office that had control of the yard in which the car was located."

The record discloses that plaintiff had, on Friday afternoon, July 10th, resold the three cars of potatoes to Baldwin & Company in Chicago, giving Baldwin & Company to understand that the potatoes would be diverted so as to arrive in Chicago Monday morning July 13, 1914; that had the cars left Pittsburgh Saturday evening they would have arrived in Chicago on the Monday following; that by reason of the fact that the agent of defendant in St. Louis did not wire the order but sent same by mail to the defendant company's agent, Mitchell, commercial freight agent in Pittsburgh, the cars were not reshipped out of Pittsburgh until Tuesday, July 14th or Wednesday, July 15th, and did not arrive in Chicago until Thursday, July 16th, or Friday, July 17th; that the price of potatoes in Chicago on July 16th and 17th was much lower than the price thereof on July 13th; that Baldwin & Company refused to accept the potatoes when they arrived in Chicago at and for the price at which they had been sold by the plaintiff to them on the Friday preceding, with the result that plaintiff ordered Baldwin & Company to sell the potatoes for their account, which they did, and that the price obtained was much less than the price at which they had been sold to Baldwin & Company.

Defendant offered an instruction in the nature of a demurrer at the close of plaintiff's case and again at the close of the entire case, each of which was overruled. The case was submitted to the jury, which returned a verdict for plaintiff and against the defendant in the sum of $1126.53. After unavailing motions for new trial and in arrest of judgment, the defendant appeals.

For a better understanding of the opinion in this case we set forth the following as a substance of plaintiff's cause of action as contained in plaintiff's amended petition:

"Plaintiff states that on or about July 11, 1914, the defendant had in its possession at Pittsburgh, Pa., holding for diverting or reconsigning orders, three carloads of potatoes, its property, consisting of 560 barrels, 180 barrels of which were loaded in car No. 10446, 190 barrels in car No. 2194 and 190 barrels in car No. 2290.

Plaintiff states that on the morning of said July 11, 1914, it gave to the Vandalia Railroad Company at St. Louis, Missouri, acting as the agent for the defendant, diverting or reconsigning orders for said three cars of potatoes, by the terms of which said diverting or reconsigning orders said cars were to be diverted or reconsigned out of Pittsburgh, Pa., to Chicago, Ill., there to be delivered to F. E. Baldwin & Company.

"Plaintiff states that the said Vandalia Railroad Company, acting as agent of defendant as aforesaid, received and accepted said diverting or reconsigning orders, so given as aforesaid, and agreed with plaintiff for the defendant to immediately divert or reconsign by wire said cars of potatoes to Chicago, Ill., there to be delivered to F. E. Baldwin & Company.

"Plaintiff states that had the defendant immediately diverted or reconsigned said cars to Chicago, Ill., on said July 11, 1914, the same would have arrived in Chicago, Ill., on Monday, July 13, 1914, but plaintiff states that the defendant did not immediately re-

consign or divert by wire or otherwise or cause to be so diverted said cars to Chicago, Ill."

In taking up the questions involved in this appeal we need not pass upon the question as to whether or not plaintiff's petition is sufficient to base upon it a count that the carrier was liable for negligence in the alleged failure of the defendant to divert or reconsign the cars in question with reasonable dispatch or within reasonable time.

As we read the petition there can be no question but that it alleges a definite breach of an alleged oral special agreement set out therein, namely, an oral agreement on the part of defendant to immediately divert or reconsign, by wire on July 11, 1914, three cars of merchandise at Pittsburgh. The testimony adduced in the case conclusively shows that plaintiff tried the cause upon the theory that such was the only issue raised by the pleadings, and plaintiff's principal instruction, which covers the entire case and directs a verdict, which in fact was its only instruction outside of one on the measure of damages, clearly and unequivocally rests the case upon the sole question as to whether or not the plaintiff had proven the oral special agreement pleaded by it in its petition, and whether or not there had been a breach thereof on the part of the defendant.

In this state of the record the determinative question is whether or not the special contract alleged by plaintiff "to immediately divert or reconsign by wire on July 11, 1914" is void under the Federal Interstate Commerce Law.

By the 6th section of the original Act of 1887 (24 Statutes at Large, p. 379, Chap. 104, U. S. Compiled Statutes Supp. 1911, p. 1284) it is required that carriers subject to the Act "shall print and keep for public inspection schedules showing the rates, charges and classifications, and any rules and regulations which in any wise change or affect or determine any part or

the aggregate of such aforesaid rates and fares and charges." . . . "And when any such common carrier shall have established and published its rates, fares and changes, in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, *or for any service in connection therewith,* than is specified in such published schedule of rates, fares and charges as may at the time be in force." (Italics ours.)

By the Act of February 19, 1903, known as the Elkins Act, amending the Act of 1887 (32 Statutes at Large, p. 847, Chap. 708, U. S. Compiled Statutes Supp. 1911, p. 1309) it is made "unlawful for any person, persons or corporations to offer, grant or give, or to solicit, accept or receive, any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to regulate commerce and the Acts amendatory thereto, whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariff published and filed by such carrier, as is required by said Act to regulate commerce and the Acts amendatory thereto, *or whereby any other advantage is given or discrimination is practiced."* (Italics ours.)

Under the Act a published tariff, so long as it is in force, has the effect of a statute and is binding alike on carrier and shipper. [Pennsylvania Ry. Co. v. International Coal Co., 230 U. S. 184, l. c. 197.] And with respect to the services governed by the Act, the rule that both carrier and shipper are bound by and cannot alter the terms of service as fixed by the filed regulations, applies not only to rates, but also to other stipulations relating to service and facilities within the purview of the Act. [Southern Ry. Co. v. Prescott, 240 U. S. 632.] And the effect to be given the provisions of an interstate shipping contract is governed

by the decisions of the Federal courts and state courts are bound to follow their rules. [Clegg v. St. Louis, etc., Ry. Co., 203 Fed. 971, 122 C. C. A. 273; Hamilton v. Chicago, etc., Ry. Co., 177 Mo. App. 154, 164 S. W. 248; Bailey v. Mo. Pac. Ry. Co., 184 Mo. App. 457, 171 S. W. 44; Dunlap v. Chicago, etc., Ry. Co., 187 Mo. App. 201, 172 S. W. 1178.]

Under our Federal laws the shipper is bound to take notice of the filed tariff rates and so long as they remain operative they are conclusive as to the rights of the parties in the absence of facts or circumstances showing an attempt at rebating or false billing. [Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U. S. 173; Kansas City & Southern Ry. Co. v. Carl, 227 U. S. 657.] And no oral agreement can be given a prevailing effect which will be contrary to the filed schedule, in that to do so would open the door to special contracts and defeat the primary purposes of the Interstate Commerce Act, which requires equal terms to all shippers and the charging to all of but one rate and that the rate filed, as required by the Act. [Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, supra; Kansas City & Southern Ry. Co. v. Carl, supra.]

We have found no authority and have been cited none, which holds that there is a common law duty on the part of the carrier to reconsign or divert cars in transit upon request of the shipper *immediately by wire,* and as we read the record before us it is barren of any testimony directly bearing upon the question as to what the prevailing custom, if any, may be on the part of carriers when directed to reconsign or divert cars in transit; whether it is customary for the carrier to carry out such request by mail or by wire. The provisions covering diversions as set out in the tariff on file with the Interstate Commerce Commission, and in effect during all the period that the transportation of the cars in question is involved, filed by the New York, Pennsylvania and Norfolk Railroad Company, with initial carrier, a copy of which tariff, duly certified to by the

201 M. A.—40

Secretary of the Interstate Commerce Commission, was introduced in evidence on the part of the defendant below, and provides: "(1) Carload tariff which has been changed from the original to a new destination prior to arrival at the original destination will be known as a diversion: Upon receipt of written request prior to arrival at original destination the carrier will make reasonable effort to accomplish the change desired but will not be responsible in the event of failure on the part of any of its employees to accomplish such diversion." Therefore in the absence of testimony as to the customary manner of handling, reconsigning or diverting cars on the part of the carrier, and in light of the provisions regarding diversions, filed with the Interstate Commerce Commission by the initial carrier, which we hold governs the diversion or reconsigning of the cars in this case, we come to the conclusion that plaintiff failed to make out a case sufficient to go to the jury unless it be that we can hold the plaintiff has made out a case under its theory of a special contract, which was the theory upon which the learned trial judge submitted the case to the jury.

As we have stated above it is not within the power of the carrier to give, at its option, special privileges to a shipper; any services contemplated to be done by the carrier must be equally applicable to all shippers under like circumstances and such services must be stated in its filed tariff under the provisions of the Act to regulate commerce. We concede it is within the power of the carrier, for a consideration, to contract for such special services as it is here claimed were agreed upon between the plaintiff and defendant, provided the carrier makes and publishes a rate for such services open to all. So far as can be determined from this record this was not done but rather, "the shipper . . . was contracting for an advantage which was not extended to all others, both in the undertaking to carry so as to give him a particularly expedited service and a remedy for a delay not due to

negligence. . . . An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs, and for a breach of such a contract, relief will be denied because its allowance without such publication is a violation of the act. It is also illegal because it is an undue advantage, in that it is not one open to all others in the same situation.'' [Chicago & Alton Ry. Co. v. Kirby, 225 U. S. 155, l. c. 165.]

The alleged breach of the special contract sought to be relied upon by plaintiff in the instant case, when stripped of extrinsic matters, resolves itself to simply this, that defendant did not divert the cars out of Pittsburgh by wire so as to have them go by a particular train. In other words, plaintiff seeks to enforce a special agreement by which, according to plaintiff's interpretation thereof, the carrier guaranteed to cause plaintiff's cars to be immediately diverted by wire so that they would leave Pittsburgh by the evening train and arrive in Chicago Monday morning. This the defendant could not do; it was tantamount to an agreement (if made) on the part of the carrier, ''to guarantee a particular connection and transportation by a particular train so as to give an advantage by preference not open to all and not provided for in the published tariffs.'' [Chicago & Alton Ry Co. v. Kirby, supra.]

Whether plaintiff could have recovered upon the carrier's contract to divert or reconsign with reasonable dispatch or within reasonable time, is a matter that is not presented to us by this record. As we have stated above plaintiff treated its petition as based upon the breach of a special contract alone, as is evidenced by all the testimony and the instructions in the case.

It follows from what we have stated above that the learned trial judge should have sustained defendant's demurrer. The judgment is accordingly reversed and the cause remanded for such further proceedings as are not inconsistent with this opinion.

*Reynolds, P. J.,* and *Allen, J.,* concur.