VIA GRAVES v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—118 S. W. (2d) 787.

Division Two, May 3, 1938.*

*NOTE: Opinion filed at September Term, 1937, December 17, 1937; motion for rehearing filed; motion overruled at May Term, 1938, May 3, 1938.

*Thomas J. Cole, Forrest P. Carson, Ragland, Otto & Potter* and *Montgomery, Martin & Montgomery* for appellant.

*Wendell W. McCanles* for respondent.

TIPTON, J.—In the Circuit Court of Pettis County, Missouri, respondent recovered a judgment against appellant in the sum of $10,000, for personal injuries received when appellant's freight train on which he was riding was derailed.

Respondent was in the employ of J. W. Morrison. Morrison owned six show horses which he exhibited at the American Royal Stock Show at Kansas City, Missouri, in November, 1931, and at the close of that show these horses were being shipped from Kansas City to Chicago, Illinois. The car in which the horses were being

shipped was divided into stalls, three at either end of the car; the middle of the car was arranged to carry the trunks, beds of caretakers, sulkeys, saddles and harness, and it was there that respondent and three other employees of Morrison rode. Respondent was employed to shoe the horses, but when not so engaged he was required to assist in taking care of them. As the train to which this car was attached approached Myrick, Missouri, it was derailed, causing respondent to be seriously injured.

Appellant's main contention is that its demurrer to the evidence should have been sustained. Respondent's petition alleged that the operation and management of the train was under the direct control and suprvision of appellant and that he (respondent) had nothing whatever to do with same; "that he was riding as an attendant of stock as aforesaid with the knowledge and permission of the said defendant (appellant) and was a passenger thereof."

Appellant's answer denies that respondent was a caretaker for the shipment of livestock, that he purchased at any time a drover's ticket before boarding appellant's train, that he signed the caretaker's contract, that he paid or offered to pay any sum whatsoever for transportation, or that he entered into any contractual relationship whatsoever for transportation on appellant's railroad. It stated that if respondent was riding in and with a car of livestock being transported by appellant from Kansas City, Missouri, to Chicago, Illinois, on November 22, 1931, as alleged in the petition, his presence was unlawful and in violation of the tariffs regulating the transportation of attendants of livestock transported in interstate commerce as approved by the Interstate Commerce Commission, and the laws of Missouri relating thereto, and that he was a trespasser and not an attendant of livestock nor a passenger.

Appellant does not deny that the derailment was caused by its negligence, but contends that the relationship of carrier and passenger did not exist between it and respondent. As we view the pleadings in this case, the ultimate fact to be determined is: Was respondent a passenger at the time he was injured?

Appellant introduced in evidence as an exhibit a certified copy of a joint circular of the freight traffic department and passenger traffic department on file with the interstate commerce commission. It provides that one caretaker is entitled to accompany shipment of one car of livestock, and if more than one caretaker accompanies the car, then tickets will be furnished the additional caretakers at the lowest one-way fare, and such tickets must be endorsed on the back showing names of attendants, name of shipper, number and date of freight waybill, point of origin and point of destination. It also provides that, "Attendant or attendants will be provided with regular livestock contract by the carrier's agent at shipping point, which, when

properly executed, will be accepted by the conductor of the train on which the stock is handled as the authority for the free transportation of such attendant or attendants. Conductors in charge of train on which the stock is transported will certify in the space provided on the livestock contract for such certification, that such attendant or attendents actually accompanies the stock between the points where the stock was handled on his train.''

There was also introduced a certified copy of interstate freight tariffs of appellant on file with the Interstate Commerce Commission. It contains the uniform livestock contract and sets out the regulations regarding free transportation, in conformity with the joint circular to which we have already referred.

■ This being an interstate shipment, it was governed by the Interstate Commerce Act and amendments thereto. This act (49 U. S. C. A., sec. 6, par. 1) provides that every common carrier shall file with the Interstate Commerce Commission and print and keep open to public inspection schedules showing all rates, fares and charges for transportation between points on its own route and points on routes of any other carrier. This act further provides that all contracts of shipment must be in writing, and no contract can be entered into between a carrier and a shipper that has not been approved by the commission. The object of the act is to provide equal facilities to all shippers; that is, to give every shipper the same service for the same rate. Any special contract entered into between a carrier and a shipper which is not open to all shippers is void. [Adams Express Co. v. Groninger, 226 U. S. 491, 33 Sup. Ct. 148; Kirkendall v. Union Pac. Railroad Co., 200 Fed. 197; Miller v. Maine Central Railroad Co., 47 A. L. R. 720; Cicardi Bros. Fruit & Produce Co. v. Pennsylvania Co., 201 Mo. App. 609, 213 S. W. 531; Thee et al. v. Wabash Railroad Co. (Mo. App.), 217 S. W. 566; Chicago & Alton Railroad Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648; Norfolk Southern Railroad Co. v. Chatman, 244 U. S. 276.]

■ We see, therefore, that under the tariff regulations approved by the Interstate Commerce Commission appellant and shipper Morrison could have entered into a contract for the shipment of horses to Chicago with one or four caretakers. As neither the original nor the duplicate contract was introduced in evidence, it will take a detailed statement of the facts to determine the contract.

The deposition of John Starliper, taken on behalf of appellant, was introduced by respondent. Starliper testified that at the time of the derailment he was employed by J. W. Morrison as groom; that he was in charge of the car or horses; that riding in the car with him were Blaze Jackson, LeRoy Appel, and respondent, that the blank contract attached to the deposition was like the contract Daniels had given him, which was the contract for the shipment of the horses;

that Daniels was a trainer of horses and an employee of J. W. Morrison; that the blanks in this exhibit were not filled out; that the contract Daniels had given him was lost in the wreck; that he did not examine it, "Just looked at it; it looked like the usual contract and put it in my pocket;" that the other caretakers did not have any tickets or contracts, "I had the contract for our transportation;" that the wreck occurred before the conductor came around to take up the contract; that it was customary for the conductor to take up the contract at a division point; that when asked if he signed the contract, he replied, "I don't just remember." On this point he testified: "Q. But it was signed by you or Mr. Daniels? A. Yes, I guess so. It was not signed by me. It was brought down to me to the car and given to me there." Also, "Those contracts are just made out and handed to the man in charge of the horses, who rides with the horses, and he (respondent) never signed it." He further testified: "Q. Did you have any sort of ticket or contract for your transportation? A. A contract, yes, I had the contract. Q. Did the rest of the party you have mentioned have any ticket or contracts? A. No, Sir, I had the contract for our transportation."

Respondent testified that he had no ticket; that the "boss" paid his fare; that he was told by Starliper to get into the car; and that before the train left Kansas City the conductor came to the car and took the names of the persons riding in the car.

In reviewing this evidence in the light most favorable to respondent, as we must do on ruling the demurrer to the evidence, it would be unfair to say that the amount paid for the transportation of the horses did not include the four caretakers. However, we will say the evidence shows that respondent had neither signed the contract, as required of a caretaker, nor had a ticket. Whether he could have signed the contract in transit, or whether a contract calling for four caretakers would have been sufficient to comply with the approved regulations without a ticket, we do not think necessary to decide.

We find nothing in the act that makes a trespasser of one who boards a train without first having obtained a ticket or pass for his passage. Violations of the Interstate Commerce Act and the amendments thereto subject the offenders to a fine not exceeding $5000, and in some instances imprisonment not to exceed two years.

But irrespective of whether the rules and regulations of the Interstate Commerce Commission had been complied with, we do think that the relation of passenger and carrier existed between respondent and appellant. This is not a suit upon the contract of shipment; respondent was not a party to that contract; nor is it a suit for a violation of any provision of the Interstate Commerce Act. Under our laws respondent was a passenger because he boarded the train in

good faith, thinking his passage had been paid, and because his presence was known to appellant who undertook to transport him as a passenger. Under these circumstances, we cannot say that since the derailment occurred before the conductor had had time to collect the contract, or tickets, even though respondent did not have proper transportation, he thereby became a trespasser. The jury would have a right to infer that if the contract Starliper had in his possession did not provide for respondent's passage, either respondent or Starliper would have paid the conductor for his transportation under facts already related.

■ Of course, the relation of passenger to carrier can be created only by contract, either expressed or implied. [O'Donnell v. K. C., St. L. & C. Railroad, 197 Mo. 110, 95 S. W. 196.] An implied contract is created when the carrier does something which indicates its acceptance of the person as a passenger. [Banks v. Kansas City Rys. Co., 280 Mo. 227, 217 S. W. 488.]

In the case of Muehlhausen v. St. Louis Railroad Co., 91 Mo. 332, 2 S. W. 315, we held that where one, although he has paid no fare, is on a railway car with the knowledge and permission of the person in charge thereof, he is a passenger and is entitled to the same care and protection as if he had paid his fare.

In Buck v. People's Street Ry., Electric Light & Power Co., 108 Mo. 179, l. c. 185, 18 S. W. 1090, we said:

"Plaintiff was lawfully upon the car. By consenting to his riding there, defendant became bound to exercise toward him the same care as toward other passengers."

In Sherman v. Hannibal & St. Joseph Railroad Co., 72 Mo. 62, l. c. 65, we said:

"As the conductor, after he became aware of his presence on the train, suffered him to remain, he was entitled to the same protection as if he had paid his fare."

In the case of Southern Pac. Co. v. Schuyler, 227 U. S. 612, deceased was in the mail service of the government and was given a pass on all railroads in four states to ride in mail coaches. On a trip from Oakland, California, to Ogden, Utah, while on personal business, he was killed in a wreck. The carrier contended that the pass was good only when used on government business. The Supreme Court of the United States held that although the pass may not have been good for his personal use, yet, since the carrier had accepted it for his transportation, he was entitled to the benefit of a local law which rendered the carrier responsible for exercising care for his safety because the carrier voluntarily undertook the burden of such care.

In passing on the case the court said:

"But, finally, it is argued that it was beyond the power of the state court to 'read into the Hepburn Act an exception in favor of

gratuitous passengers;' thereby (as is said) enlarging the class to whom Congress limited the right of free interstate transportation. This is ingenious, but, as we think, unsound. As applied to the concrete case, it is equivalent to saying that the operation of the Hepburn Act is such as to deprive one who, in good faith and without fraud, and with the consent of the carrier, but in actual, though unintentional, violation of the prohibition of the act, accepts a free passage in interstate transportation, of the benefit of a rule of local law that renders the carrier in such circumstances responsible for exercising care for the passenger's safety because the carier has voluntarily undertaken the burden of such care. But the act itself declares what penalty shall be imposed for a violation of its prohibition: 'Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than one hundred dollars nor more than two thousand dollars, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass or free transportation, shall be subject to a like penalty.' This penalty is not to be enlarged by construction. Neither the letter nor the spirit of the act makes an outlaw of him who violates its prohibition by either giving or accepting gratuitous interstate carriage. The deceased no more fortified his life, limb or safety, and no more forfeited his right to the protection accorded by the local law to a passenger in his situation, than the carrier forfeited its right of property in the mail car upon which the deceased rode. His right to safe carriage was not derived, according to the law of Utah, from the contract made between him and the carrier, and therefore was not deduced from the supposed violation of the Hepburn Act. It arose from the fact that he was a human being, of whose safety the plaintiff in error had undertaken the charge. With its consent he had placed his life in its keeping, and the local law thereupon imposed a duty upon the carrier, irrespective of the contract of carriage. The Hepburn Act does not deprive one who accepts gratuitous carriage, under such circumstances, of the benefit and protection of the law of the state in this regard.

"It results that the judgment under review must be affirmed, irrespective of the question whether the Hepburn Act forbids the giving of free interstate transportation to the employees of the Railway Mail Service when not on duty."

In the case of Chesapeake & Ohio Ry. Co. v. Burton, 62 Fed. (2d) 110, plaintiff sued for personal injuries. He was riding on a ticket which, though it had expired, was accepted by the conductor. In ruling the case, the court said:

"The conductor was the agent or representative of the carrier in charge of the train upon which the plaintiff rode, and it was his

duty to pass on such a question as arose when the passenger presented the ticket. . . . He accepted the ticket from the passenger and in the absence of any illegality, or bad faith, deceit, or fraud, on the part of the passenger, his act bound his principal, the railway company. . . . His conduct was binding on the railroad and it may not escape responsibility to the plaintiff who was lead to suppose that his offer to ride upon the train as a passenger had been accepted by the railroad's representative.''

In the case of Robostelli v. N. Y., N. H. & H. Railroad Co., 33 Fed. 796, the court held that where a person, in good faith and without attempt to conceal his identity, uses a nontransferable ticket issued to another and it is accepted, he is a passenger.

In the case at bar, respondent testified that his ''boss'' paid his fare. While this is a conclusion, yet it is evidence that he was on the train in good faith. There was evidence that his presence was known to the conductor. Starliper testified that the caretakers were in the car with the show horses, and from his testimony it is inferable that it was necessary for them to be there to take care of the horses. The beds for these four caretakers were in the car, which fact was bound to have been known to the conductor after he had come around to take the names of the caretakers before the train left Kansas City. Under these circumstances, certainly respondent was a passenger. As previously stated, since the derailment took place before the conductor had had time to collect the contract for respondent's passage, the jury had a right to infer that if the contract did not provide for his passage, either he or Starliper would have paid his transportation charge. Until he refused to pay it, he was a passenger.

Nor do we think respondent was guilty of contributory negligence as a matter of law. Whether one is guilty of contributory negligence depends upon the particular facts and circumstances surrounding the accident that caused his injuries. It is true that in the case at bar respondent was not riding in the caboose, but was riding in the car with the horses. This fact was known to the conductor. These horses were show horses and needed more attention than ordinary livestock while being transported. The evidence shows that a place had been fixed in the car for the attendants to ride and sleep. This was also known to the conductor. Moreover, respondent's injuries were received as a result of the derailment of the train. In fact, from the pictures that accompany this record, it is reasonable to assume that all or nearly all of the cars left the track. This is not a case where the livestock was thrown against respondent on account of rough handling of the car. We do not see where the fact that respondent was in the car with the horses contributed to his in-

juries, as his injuries were caused by a derailment brought about by the defective condition of the track.

In the case of Bolton v. Mo. Pac. Railroad Co., 172 Mo. 92, 72 S. W. 530, the attendant was injured while riding in the car with the livestock, which fact was known to the conductor. We held that since the conductor had knowledge of the fact that he was in that car, the attendant was not guilty of contributory negligence as a matter of law.

Appellant relies upon the cases of Scrivner v. Mo. Pac. Railroad Co., 260 Mo. 421, 169 S. W. 83, and Vulgamott v. Hines (Mo. App.), 229 S. W. 394. (The latter case was before this court on certiorari under the style of State ex rel. Vulgamott v. Trimble et al., 300 Mo. 92, 253 S. W. 1014.) These cases are not in point because the contract of shipment prohibited the caretaker from riding in any place except the caboose, while there is nothing in the uniform contract in the case at bar which prohibits caretakers from riding in the car with the livestock.

In the case of Chaney v. L. & M. Railroad Co., 176 Mo. 598, 75 S. W. 595, plaintiff was riding on top of one of the box cars and was thrown off by the movement of the train. We held he was guilty of contributory negligence; his presence was not known to the conductor, and the opinion intimates that if this fact had been known a different result would have been reached.

Under the circumstances of this case we hold that the question of contributory negligence of respondent was a question for the jury. We think that the trial court properly overruled appellant's demurrer to the evidence.

■ The only instruction offered on behalf of respondent was one on the measure of damages. Appellant contends that it was error to submit the case without an instruction defining respondent's theory of the case.

In the case of Arnold v. May Department Stores Co., 337 Mo. 727, l. c. 739, 85 S. W. (2d) 748, we said:

"Was error committed in permitting plaintiff to go to the jury without instructions, except on the measure of damages? In Dorman v. East St. Louis Ry. Co., supra, Judge ATWOOD, in an able and exhaustive opinion, considered this question. We could not add to what is there written and ruled. Previous rulings condoning or approving the practice of submitting a cause to the jury without instructions were disapproved, and it was ruled, speaking of a plaintiff's case, that where the nature of the case requires that the jury be instructed on the issues and law involved, the trail court should refuse to submit the case to the jury without such instructions. Judge ATWOOD, speaking for the court en banc, said: 'As the plaintiff invokes the exercise by the court of its judicial powers and is

asking at its hands a redress of a supposed wrong, the court rightfully demands of plaintiff as a condition precedent to the submission of his case that (1) plaintiff set forth in his petition ''facts sufficient to constitute a cause of action,'' (2) that he produce competent evidence supporting such facts, and (3) why should he not be required, if necessary to the jury's understanding of its function in the case, to ask the court to give an instruction, formulated by him, as that duty does not devolve on the court, informing the jury what facts, if proven, will warrant the jury in returning a verdict for him. Such instructions, when given and read to the jury, become the law of the case, declared so by the court, and in accordance with which the jury is sworn to return a verdict. It is just as much an exercise of the inherent power and duty of the court to see to it that the jury be informed as to the law of the case as it is that competent evidence be adduced supporting the facts necessary to constitute a cause of action. A failure in this respect constitutes at least prima facie error. When and to what extent the same duty devolves on the defendant need not be discussed.'

''In the Dorman case, as in the case at bar, the defendant asked and was given an instruction which the court held was sufficient on the whole case, and that defendant was not prejudiced by the failure of plaintiff to submit an instruction predicating the facts relied upon for recovery. And, under the facts of the instant case, and in view of Instruction No. 1, given for defendant, we rule that defendant was not prejudiced by the failure of plaintiff to submit an instruction predicating the facts relied upon for recovery.''

As previously stated, the ultimate fact to be determined is whether respondent was a passenger or a trespasser. We think that the error in not giving an instruction on respondent's theory of the case was not prejudicial to appellant, and that the jury could have determined this question without an instruction offered by respondent. Moreover, we would hesitate to reverse this case on that ground as it was tried nearly two years before the opinion in the Dorman case was delivered, and our previous rulings had both condoned and approved the practice of submitting a case to the jury without an instruction outlining plaintiff's theory of his case.

Finding no reversible error in the record, the judgment should be affirmed. It is so ordered. All concur.