JESS R. LONG, Appellant, v. GUY A. THOMPSON, Trustee for the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation.—No. 38615.—183 S. W. (2d) 96.

Division One, October 9, 1944.

Rehearing Denied, November 6, 1944.

532

*Homer A. Cope, Cope & Hadsell* and *Walter A. Raymond* for appellant.

*Leslie A. Welch, Richard H. Beeson* and *David P. Dabbs* for respondent.

■ BRADLEY, C.—Action to recover $25,250 for damages for personal injuries and property damage alleged to have been received at a railroad crossing in Wichita, Kansas. The cause was submitted under the Kansas last chance rule. Verdict and judgment went for defendant, and plaintiff appealed.

Error is assigned (1) on the refusal of plaintiff's request to reopen the case for further evidence; (2) on giving defendant's withdrawal instructions F and M and on giving withdrawal Instruction Y on the court's own motion; (3) on the refusal of plaintiff's instruction No. 5 submitting primary negligence as to condition of crossing; and (4) on the refusal of plaintiff's instruction No. 6 submitting the cause under the Kansas wanton negligence rule.

Plaintiff resided on a farm about ten miles south of Wichita. On the morning of April 22, 1939, he left home in his Chevrolet pickup truck, accompanied by his nephew, Robert Bryant, age 18. Robert's home was with his mother and stepfather, who resided in Wichita and about one-half block north of the crossing in question. Plaintiff was taking his nephew home, and arrived at this crossing about 6:45. He was driving north on St. Paul Street, an unpaved street; the railroad track extends somewhat northwest and southeast. Newell Street, an east and west street, intersected St. Paul just south of the crossing. West of St. Paul, Newell Street was south of the railroad track, and east of St. Paul, Newell was north of the track. The passenger train that struck plaintiff approached from the northwest. The sun was up; track and street dry, and the adjacent area practically level.

Plaintiff's evidence tended to show that no warning of the train's approach was given by bell or whistle, and that until within 25 or 30 feet of the track the view to the northwest of one approaching in a vehicle from the south might be somewhat obstructed by a yard some four feet above the street level, and by a four foot hedge along the east side of the yard, and by a bushy cedar tree near the northeast corner of the yard. But it is, in effect, conceded that when about 20 feet from the track there was no obstruction to the northwest along the track for some 2,000 feet. Plaintiff testified that when about 20 feet from the track he stopped and looked both northwest and southeast; that he saw no train and heard none; that he then moved forward at 4 or 5 miles per hour and at that rate could have stopped in 4 or 5 feet. There was an upgrade of probably two feet in the roadway of St. Paul Street which upgrade began a short distance, probably 5 or 6 feet south of the track, and plaintiff's evidence was to the effect that there were chuckholes between the rails. In plaintiff's statement, it is said:

"He (plaintiff) pulled up to the incline over the hump until his front wheels went across the south rail of the track. He felt the front wheels drop into a chuckhole eight or ten inches deep. He had no previous knowledge of the presence of these chuckholes. At practically the same time his nephew said, 'Train, Jess', and he (plaintiff) looked to the left and saw a train approaching and then about 150 to 200 feet away. He stepped on the motor quick and it went dead."

Plaintiff's instruction No. 1, omitting some superfluous "if sos", told the jury to find for him if they found that the truck engine went dead "and that plaintiff was then and there in a position of imminent and inescapable peril from the approach of said railroad train . . . and that after plaintiff got into such position of imminent and inescapable peril the defendant's engineer operating said railroad train for the defendant saw, or by the exercise of ordinary care, could have seen plaintiff in such position of imminent and inescapable ▓ peril, and saw, or by the exercise of ordinary care, could have seen that plaintiff was unable to extricate himself therefrom, and that thereafter, said engineer of the defendant operating defendant's said train, by the exercise of ordinary care and with the means and appliances at hand and with safety to himself and other persons on said train, and said train itself, could have stopped said train", and avoided the collision.

▓ Was it error to refuse to reopen the case? The request to reopen was made on the morning following plaintiff's closing on the previous afternoon, but before defendant had put on any evidence. Counsel for plaintiff stated to the court that he desired to recall witness Bryant (plaintiff's nephew) to ask him "how much time elapsed in his judgment and opinion from the time that the front wheels of the truck driven by plaintiff went over the south rail of the

railroad track and bogged down . . . to the time the witness Bryant himself looked up and saw the train approaching and notified his uncle.'' The objection to the request to reopen was on the ground that ''Bryant was fully interrogated on all these subjects both on direct and cross examination.'' The request was refused ''for the specific reason that the witness Bryant has testified to the facts and their sequence and the matter now presented is fully before the jury on fact evidence. The request to reopen concerns opinion evidence only, and in the opinion of the court, would not aid the jury in arriving at any conclusion, being opinion evidence from a layman and not of any substantial benefit to the jury.''

Bryant testified: ''Q. Now, when was it, with reference to the front wheels going over the first rail or south rail of the railroad track and going down in between the rails this six or eight inches, when you saw this train? A. Will you state that again, please? Q. I will reframe the question. Did you see a train about the time that the front wheels went over the south rail of the railroad track and went down about six or eight inches, did you see a train? A. Yes, sir. Q. Or did you warn your uncle about a train or something like that? A. Just then I looked up and saw the train and hollered, 'Train.' Q. All right. Now, when was it that—what I am trying to get at is, when was it that you looked up and saw a train and hollered, 'Train', with reference to the time that the wheels went over the first rail and down into this depression six or eight inches deep? A. That was right after he stepped on it, tried to get it started again. . . . Q. And how far away would you judge the train to have been from the crossing, that is, the front end of the train, or the front end of the engine from the railroad crosssing at the time you observed it at that time, which you have just described, and hollered at your uncle in the manner that you did? A. Well, it was a good 200 feet.''

Bryant said (as appears) that he saw the train about the time the front wheels of the truck went over the south rail and into the chuckholes, and that at that time the train was 200 feet away. There was evidence that the train was moving about 35 miles per hour. From all this, the lapse of time plaintiff sought to establish, by reopening, could have been determined by a mathematical calculation, hence such evidence, in a fashion, was already before the jury. Ordinarily, in such situation, reopening would not have been denied. However, reopening was something within the sound discretion of the court, Goodrich v. Kansas City, Clinton & Springfield Ry. Co., 152 Mo. 222, 53 S. W. 917; Hays v. Western Union Tel. Co., 236 Mo. App. 19, 150 S. W. (2d) 511, 1. c. 513; Blomeyer et al. v. Willey (Mo. App.), 151 S. W. (2d) 535, 1. c. 536, and cases there cited, and we do not think that the trial court so abused its discretion as to amount to reversible error.

■ Plaintiff complains on defendant's withdrawal instructions F and M and on Y, given on the court's own motion. Instruction F withdrew from the jury's consideration the charge that defendant negligently failed to give reasonable and timely warning of the train's approach by sounding the whistle or bell. Instruction M withdrew "all the claims" of negligence, except under the Kansas last chance rule. Y was given after argument and after the jury had retired. After the cause had been in the lap, so to speak, of the jury for some 30 minutes, the jury sent to the court this written message: "According to your Honor's instructions to us jurors, are we ■ specifically instructed to disregard the speed of this particular train—or should the City of Wichita ordinance be taken into consideration?"

Upon receipt of the message the court recalled the jury and gave instruction Y, which follows: "The court instructs the jury that in arriving at your verdict, you will take into consideration the speed of the train that you find and believe from the evidence the train was moving at the time that the plaintiff and the automobile in which he was riding reached a position of imminent and inescapable peril, if so. You are further instructed that the speed ordinance of the City of Wichita, which was introduced in evidence, is withdrawn from your consideration." After giving instruction Y the court permitted counsel to reargue—4 minutes to the side.

To support the assignment on the withdrawal instructions, plaintiff cites Shumate v. Wells, 320 Mo. 536, 9 S. W. (2d) 632; Seithel v. St. Louis Dairy Co. (Mo. Sup.), 300 S. W. 280; Reith v. Tober, 320 Mo. 725, 8 S. W. (2d) 607. The general rule, it seems, is that the giving of withdrawal instructions is a matter for the sound discretion of the trial court, but if a withdrawal instruction would confuse the mind of the jury as to the ground upon which the cause is submitted, then such withdrawal instruction should not be given. Here, the sole issue submitted was whether the train could have been stopped as predicated in plaintiff's instruction No. 1. Plaintiff's evidence tended to show that the train could have been so stopped. Defendant's evidence tended to show the contrary. The issue was clear and simple. Neither of the withdrawal instructions could have confused, and it was not error to give them.

■ Plaintiff's refused instruction No. 5 would have submitted the alleged primary negligence as to the condition of the crossing, that is, that the crossing did not meet the requirements of the Kansas Revised Statutes—Chapter 66, Article 2, Secs. 227 and 231, and plaintiff says that the instruction is broad enough to submit common law negligence as to the condition of the crossing. Defendant says that plaintiff's contributory negligence bars recovery as a matter of law on primary negligence, but if such is not the case, defendant says that the Kansas statute pleaded by plaintiff does not apply to the

crossing in question, and that common law negligence as to the condition of the crossing was not pleaded.

As appears, supra, it is, in effect, conceded that from a point 20 feet south of the track the view to the northwest along the track for some 2,000 feet was unobstructed. Plaintiff, according to his own evidence, stopped his truck about 20 feet south of the track, and looked northwest, the direction from which the train came; he then started up and drove at 4 or 5 miles per hour and could have stopped in 4 or 5 feet. Assuming that the front wheels of the truck were 20 feet south of the south rail when plaintiff stopped, and assuming that the front wheels were 2 feet over the south rail when they went into the chuckholes, then the truck moved 22 feet before reaching the chuckholes. Bryant, plaintiff's witness, said that he saw the train 200 feet west about the time "the front wheels went over the south rail of the railroad track" and into the chuckholes. At 4 miles per hour, the truck moved approximately 6 feet per second and required 3-2/3 seconds to move the 22 feet. We think that the most favorable speed of the train for the present question is 35 miles per hour, approximately 52½ feet per second. The train was 200 feet away when the front wheels of the truck went into the chuckholes. On this evidence, when plaintiff started up, 20 feet south of the track, the train was then 392½ feet from point of collision, and was in plain view. If Bryant did not look and see the train 200 feet away at the very moment the front wheels of the truck went into the chuckholes, but looked and so saw some appreciable length of time thereafter, still it could not be that the train was not in plain view when plaintiff started up 20 feet south of the track.

In McCune v. Thompson, 147 Kans. 57, 75 Pac. (2d) 294, the court said: "A person about to cross a railway track must first assure himself that no train is approaching and that it is safe to cross. If he attempts to cross without first making sure that he can safely do so, he is guilty of negligence, and he will not be permitted to penalize the railway company if an accident occurs." Quite a number of Kansas cases are reviewed in the McCune case to which we make reference. As we see it, plaintiff, under the Kansas law, was guilty of contributory negligence as a matter of law, and was not entitled to go to the jury on primary negligence. It will ▆ not be necessary to rule other questions pertinent to the crossing.

▆ Was it error to refuse plaintiff's instruction No. 6 which would have submitted the cause under the Kansas wanton negligence rule, which rule precludes the defense of contributory negligence? To support the assignment based on the refusal of instruction No. 6, plaintiff relies principally upon Atchison, Topeka & Santa Fe Ry. Co. v. Baker, 79 Kans. 183, 98 Pac. 804. In that case, Mrs. Baker, 71 years old, was killed by a train and the Kansas wanton negligence rule was held to be applicable. The situation obtaining in that case

is reflected in this language by the court: "The running of a train at an excessive speed along or across a busy street of a populous city, without either outlook or signal, may well be held to exhibit such contempt for the rights of others as to supply the place of positive malice."

In the present case there is no evidence of any such lapse of duty on the part of the engineer as in the Baker case. On the contrary, the evidence is that the engineer, McBride, was on the lookout. Plaintiff introduced the deposition of McBride. He testified that he had been a railroad engineer for the Missouri Pacific for 38 years; that as he approached the crossing here concerned he was running around 35 miles per hour; that he had never noticed any great amount of traffic on St. Paul Street; that he saw plaintiff's truck when it was about 60 feet south of the crossing and that at that time the truck was traveling about 10 miles per hour and that at that time the train was 300 or 400 feet west of the crossing; that the truck looked like it was going to stop. "Q. And you think he was going about ten miles an hour? A. Yes. Q. And he just kept coming? A. Yes, kept moving along, slowing down a little. Q. And when you got within 50 feet you decided he wasn't going to stop? A. Yes. . . . Q. Then what did you do? A. I let loose the whistle and applied the air." The engineer also testified that he was keeping a lookout that morning and "had the whistle going at all those crossings."

On cross examination McBride testified that the locomotive bell was turned on "three miles out in the country" and continued to work automatically all through that territory. "Q. And do I understand as you came into town, came by the vinegar works you were blowing your whistle that morning, the regular crossing whistle for this crossing, that is some 800 feet, or thereabouts, west of St. Paul Avenue crossing? A. Yes, sir. Q. And that whistle consisted of two longs and then a short blast and then a long blast that you held down or held onto, or prolonged, until the engine got onto that crossing? A. Yes, sir. Q. And then when you got over that crossing you started in blowing the whistle again on two longs and a short and a long for the St. Paul crossing? A. Yes, sir. Q. And from that crossing on down to the St. Paul crossing the track is practically straight? A. Yes, sir."

In Jacobs v. Atchison, Topeka & Santa Fe Ry. Co., 97 Kans. 247, l. c. 255, 154 Pac. 1023, it was held that "wantonness precluding a defense of contributory negligence cannot be predicated on the omission of a duty before the discovery of a person in a position of peril on a railroad track." In Bazzell v. Atchison, Topeka & Santa Fe Ry. Co., 133 Kans. 483, 300 Pac. 1108 (headnote 1, 133 Kans., prepared by the court), the law is stated thus: "It was not error for the trial court to refuse to instruct the jury as to wanton negligence

of the engineer and fireman of the defendant railway company unless the facts and circumstances in evidence put them in a class with willful doers of wrong, and from which facts and circumstances willful and wanton negligence causing the injury could naturally and reasonably be inferred.''

It is not necessary to refer to other Kansas cases. All we have examined are to the same effect on the wanton negligence rule. We do not think that it was error to refuse instruction No. 6. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.