LEONARD MELTON, (Plaintiff) Appellant, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, (Defendant) Respondent, No. 42679—251 S. W. (2d) 663.

Court en Banc, October 13, 1952.

*Wilbur C. Schwartz* for appellant; *Joseph Nessenfield* of counsel.

476

*Coburn, Storckman & Croft, Thomas L. Croft* and *Rexford H. Caruthers* for respondent.

VAN OSDOL, C.—In this action to recover damages in the sum of $45,000 for personal injuries, the jury returned a verdict for defendant, and plaintiff has appealed from the ensuing judgment. Plaintiff was injured when he, a pedestrian, and defendant's streetcar collided at the northwest corner of the intersection of defendant's Hodiamont streetcar tracks and Union Boulevard in St. Louis.

Plaintiff declared upon negligence under the Vigilant Watch Ordinance of the City of St. Louis, and under the humanitarian rule. Defendant by answer denied negligence on its part and affirmatively stated plaintiff was contributorily negligent in going toward and against a moving streetcar when he saw or by the exercise of ordinary care could have seen or heard the approach of the moving car. The

trial court was of the opinion plaintiff was contributorily negligent as a matter of law, and refused to submit the issue of primary negligence under the Vigilant Watch Ordinance. However, plaintiff's case was submitted on the hypothesis of negligence of defendant under the humanitarian rule in failing to stop the streetcar or give a warning of its approach after defendant's operator "saw or by the exercise of ordinary care on his part could have seen plaintiff in such position of imminent peril and oblivious thereof."

Defendant's Hodiamont streetcar tracks approach and intersect Union Boulevard in St. Louis. The streetcar tracks run in a general east-west direction, although at the intersection and continuing eastwardly [666] from the intersection the tracks curve slightly to the southward; however, the tracks actually intersect the west side of the boulevard, a north-south street, at an approximate right angle. Defendant's westbound streetcars stop at the east side of Union, and proceed across the boulevard. At the intersection Union Boulevard is 60' 2'' from curb to curb. There was evidence that the distance one can see east of Union is approximately one-hundred-fifty to two-hundred feet.

The respective factual versions of how the casualty occurred as disclosed by the evidence introduced by plaintiff and defendant are diametrically opposed.

Plaintiff testified that he drove his automobile northwardly on Union and across the Hodiamont tracks about 9:00 o'clock the evening of July 24, 1948. He stopped and parked his automobile at the east curb of Union and just north of the tracks. His wife and her cousin were accompanying him, but they did not get out of the car. Plaintiff was intending to buy a newspaper at a newsstand on the sidewalk at the southwest corner of the intersection. Plaintiff, having got out of the left-hand side of his automobile, "turned south toward the car line." He stated it was customary for pedestrians to use the streetcar tracks in crossing Union Boulevard at that point. The "automobile traffic is heavy." He walked ten or fifteen feet to within twelve or eighteen inches of the north rail of the westbound track. He saw no westbound streetcar. He then walked across Union twelve or eighteen inches north of the north rail of the north (westbound) track. He stayed "close to the tracks for as much protection" as he could get from automobiles on Union which were warned to stop at the Hodiamont tracks by "stop signs" situate on Union north and south of the tracks. He walked in a comparatively straight line "following the north rail of this track." He crossed the street; approached and stepped upon the curb; and advanced two or three feet west from the curb when he was hit in the "left and back side" by the front right-hand corner of defendant's westbound streetcar, and injured. When he was hit, he had not turned to his left. "I didn't walk south on the west sidewalk." Plaintiff was familiar with the

intersection—had been there many times before. When he had got out of his automobile, had walked to the tracks, and started walking across Union, he did not turn to the left to "look particularly to see" if there was any streetcar approaching from the eastward; but if there had been a streetcar "within fifty or seventy-five feet, why, I would have seen it." After he had started walking westwardly along the north (westbound) track, and twelve or eighteen inches north of the north rail thereof, he "didn't look back." He walked along the track to be protected from automobile traffic. He did not think "of the possibility of being struck by streetcar traffic."

Defendant introduced evidence tending to refute plaintiff's testimony that he walked closely along and in dangerous proximity to the north rail of the north streetcar track. Defendant's operator testified that he made a stop on the east side of Union, and then proceeded across the boulevard at a speed of five to eight miles per hour; the headlight was on; the gong was sounding; the operator was looking, but he saw nobody near the tracks in front of the car. Defendant's evidence tended to prove that plaintiff had crossed Union north of the streetcar tracks and at a safe distance therefrom, and had turned to his left, walked southwardly on the west sidewalk of Union, and "blindly" into the right (north) side of defendant's streetcar, coming into contact with the side of the car somewhat to the rear of the front doors.

Herein upon appeal plaintiff-appellant contends (1) the trial court erred in refusing to give Instruction C proffered by plaintiff, which instruction hypothesized defendant's primary negligence in violating the Vigilant Watch Ordinance—it is contended that the question of contributory negligence was a jury question. Plaintiff-appellant further contends (2) that the court erred in giving Instruction No. 2, an instruction withdrawing the issue of defendant's negligence under the Vigilant Watch Ordinance; (3) that the court erred in admitting hearsay evidence contained in a hospital record; and the court erred (4) in giving defendant's Instruction No. 4. It is said by plaintiff-appellant that Instruction [667] No. 4 was misleading, and injected a false issue into the trial of the case.

(1) In our opinion the trial court did not err in ruling that plaintiff was guilty of contributory negligence as a matter of law. Plaintiff, by his own testimony, demonstrated his failure to exercise ordinary care for his own safety when he approached and passed along defendant's track in such close proximity to the track that he should have known he was in danger. The defendant's streetcar track itself was a warning of danger. Having alighted from his automobile, plaintiff walked near the north rail of the north track and, with no more than a mere casual glance to his left, observing the streetcar tracks only fifty or seventy-five feet to the eastward, turned right and walked westwardly across the street in dangerous proximity to the

track. Before he turned right and walked westwardly, he did not look to the eastward for oncoming westbound streetcars within the full distance of one-hundred-fifty to two-hundred feet throughout which distance he had a view of defendant's streetcar tracks. Had he done so he no doubt would have seen the oncoming streetcar. He did not again look for streetcars; in fact, he was not even thinking of being endangered by streetcar traffic. It is true that this court does not judicially know of the extent of "overhang" of a streetcar, but this court does know that a streetcar, a train or locomotive is wider than the track. Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W. 2d 738; Taylor v. Missouri, K. & T. R. Co., 357 Mo. 1086, 212 S.W. 2d 412. This is no more than common knowledge. A person of ordinary prudence should have known and appreciated the danger of walking along a streetcar track twelve or eighteen inches therefrom. Although he was walking along in dangerous proximity to the track, plaintiff testified he did not look back while he continued across the street, stepped upon the west curb of Union Boulevard, and advanced a further two or three feet to the westward. A glance over his shoulder would have disclosed to plaintiff the presence of the approaching car. Had he made reasonable use of his sense of sight and of his mental faculties, either when he first approached the tracks on the east side of the street or as he was proceeding across the street, he would not have been injured. In our opinion all reasonable minds would agree that plaintiff did not exercise ordinary care to protect himself from injury. See and examine State ex rel. Kansas City Public Service Co. v. Bland, 354 Mo. 79, 188 S.W. 2d 650; Thomas v. Wells, Mo. App., 299 S.W. 72; Goggin v. Wells, Mo. App., 273 S.W. 1107; Strutman v. United Rys. Co. of St. Louis, Mo. App., 238 S.W. 817.

(2) The trial court, having correctly ruled that plaintiff was contributorily negligent as a matter of law so that the issue of primary negligence of defendant in violating the Vigilant Watch Ordinance was not a submissible issue, the trial court did not abuse its discretion in withdrawing the issue from the jury. The given withdrawal Instruction No. 2 tendered by defendant is as follows,

"The Court instructs the jury that the plaintiff, Leonard Melton, is not entitled to recover in this case under the terms of Ordinance No. 41386 of the City of St. Louis, known as the 'Vigilant Watch' ordinance, read in evidence in this case, and the court withdraws such issue from your consideration, and in your deliberations you will ignore the same."

The general rule is that the giving of withdrawal instructions is a matter for the sound discretion of the trial court, but, if a withdrawal instruction would confuse the jury upon the issues of the cause as submitted, then such instruction should not be given. Long v. Thompson, 353 Mo. 531, 183 S.W. 2d 96; Vol. 1, Raymond, Missouri Instructions, § 157, pp. 166-167.

It is contended by plaintiff-appellant that, even though plaintiff is held to have been guilty of contributory negligence as a matter of law, and the issue of primary negligence in violation of the Vigilant Watch Ordinance was consequently not submissible to the jury, yet the giving of the withdrawal instruction (No. 2) was prejudicially erroneous. Plaintiff-appellant argues that the ''issue of lookout or keeping a vigilant watch, not as primary negligence, [668] but on the question of discoverable peril, is directly involved in plaintiff's humanitarian submission.'' It is true that the humanitarian rule extends to discoverable peril where defendant has the duty to keep a lookout. Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482. Independently of the Vigilant Watch Ordinance, defendant, in the operation of its streetcar upon or across the public streets of St. Louis, had the common-law duty to exercise ordinary care in the operation of its streetcar, including the duty to observe persons or vehicles on or near the track (Murray v. Kansas City Public Service Co., Mo. Sup., 61 S. W. 2d 334), and in the circumstances of the instant case, wherein it was shown that defendant's streetcar was being operated across or upon a busy street, the vigilance of the lookout or watch required by the common law is quite the same as that required by the ordinance. Heigold v. United Rys. Co. of St. Louis, 308 Mo. 142, 271 S.W. 773; Kinlen v. Metropolitan St. Ry. Co., 216 Mo. 145, 115 S. W. 523. See also Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W. 2d 1000; State ex rel. Vogt v. Reynolds, 295 Mo. 375, 244 S. W. 929.

Plaintiff in pleading negligence under the humanitarian rule had alleged and, as stated, plaintiff's humanitarian submission, Instruction No. 1, hypothesized that defendant's operator ''saw or by the exercise of ordinary care could have seen'' plaintiff was in imminent peril. Thus, we think it may be seen that plaintiff, in pleading and submitting negligence under the humanitarian rule, was not relying upon the Vigilant Watch Ordinance as defining the defendant's care in keeping a lookout, but was relying upon defendant's duty as defined by common law, that is, the care of an ordinarily prudent person in the same or similar circumstances, although in the circumstances of the instant case the care or precaution or vigilance in the lookout or watch was alike both at common law and by ordinance. In our view, plaintiff, in the instant case, could not have been prejudiced by the withdrawal instruction inasmuch as defendant's common-law duty to keep a lookout in the circumstances of the case was commensurate with the measure of the precaution required by the ordinance, and such common-law duty was pleaded and submitted at plaintiff's instance, and was arguable as a basis for discoverable peril as hypothesized in plaintiff's humanitarian rule submission.

It is important to notice the withdrawal instruction differs in its language from the withdrawal Instructions Nos. 2 and 3 in Shumate v. Wells, 320 Mo. 536, 9 S.W. 2d 632, cited by plaintiff-appellant.

In the instant case the withdrawal instruction did not (as did Instructions Nos. 2 and 3 in the Shumate case) set out in substance or repeat the language of the Vigilant Watch Ordinance, which language of the withdrawal instructions in the Shumate case could be differentiated from the language of the humanitarian submission only by minds "trained in the technique of pleading." In our case the instruction withdrew from the jury's consideration no facts or circumstances, which were available to plaintiff in supporting the humanitarian submission. The instruction advised that plaintiff could not recover under the terms of the ordinance and withdrew such issue from the jury, directing the jury to ignore the same.

Moreover, there is some justification for the argument of defendant-respondent that the jury (had no withdrawal instruction been given) would have been confused as to the time the humanitarian rule seized upon the situation and required defendant to act as submitted under plaintiff's Instruction No. 1 hypothesizing defendant's failure to stop. The section of the Vigilant Watch Ordinance as read into evidence in the instant case requires the person in charge of a streetcar to keep a vigilant watch for all persons and vehicles on or moving towards the track *"and on the first appearance of danger* to said persons and vehicles, the car shall be stopped in the shortest time and space possible." (Our italics.) The requirement that motorman or other person in charge of the car shall stop the car on the first appearance of danger is more than is required under our humanitarian rule. The Vigilant Watch Ordinance requires the motorman to *anticipate* "that those approaching the track will come within the danger zone and that those [669] within it will not seasonably leave it." State ex rel. Vogt v. Reynolds, supra. See also Heigold v. United Railways Co. of St. Louis, supra; Abernathy v. St. Louis Public Service Co., 362 Mo. 214, 240 S.W. 2d 914. Applied to the instant case the duty under the ordinance to stop the streetcar arose upon the first appearance of danger to plaintiff; but under the humanitarian rule, the duty to stop arose when the motorman saw or should have seen and realized plaintiff was oblivious of the streetcar's approach and was intent upon pursuing his course in dangerous proximity to the track.

(3) Defendant introduced into evidence the record of the St. Louis City Hospital which record of July 24th disclosed an "Admission Note," in part as follows,

"This 52 year old white male (plaintiff) was admitted at about 11:00 P. M. this evening. Patient was conscious and rational. *He states that he walked into the front corner of a moving street car where the Hodiamont car line crosses Union Boulevard.* He was knocked to the ground and suffered an injury to his right leg and left thoracic region. X-ray examination reveals a fracture of the neck of the right femur. - - -" (Our italics.)

And a further record of July 24th (or 25th) disclosed entries as follows,

"- - - pain in right hip and left chest. *Patient was walk-ing across the sidewalk at Union and Raymond, and either walked into street car or it struck him.* Patient was immediately knocked down and had immediate pain in right hip and left chest. *The patient was not knocked unconscious,* but was unable to get up and had pain and disability. - - -" (Our italics.)

Plaintiff-appellant objected on the ground that The Uniform Business Records as Evidence Law, RSMo 1949, Sections 490.660 to 490.-690, V.A.M.S., does not apply to hospital records, and, furthermore, that the parts of the record which we have italicized were conclusions and hearsay.

The Missouri Act is in the precise language as the Model Act approved by the National Conference of Commissioners on Uniform State Laws in 1936. The Uniform Business Records as Evidence Law, hereinafter referred to as the Act, has the purpose of avoiding the many antiquated and technical rules of common law regarding the admissibility of business records as evidence. Vol. 9, Uniform Laws Annotated, p. 385; Virden, Status of Uniform Laws in Missouri, Vol. 15, M.L.R. 274 at page 281; Vol. 6, Wigmore on Evidence, 3d Ed., § 1707, p. 36. Courts of other states where the Model Act has been adopted have considered hospital business within the purview of the statute. Loper v. Morrison, 23 Cal. 2d 600, 145 Pac. 2d 1; Sadjak v. Parker-Wolverine Co., 281 Mich. 84, 274 N. W. 719; Green v. City of Cleveland, 150 Ohio St. 441, 83 N. E. 2d 63, affirming 79 N. E. 2d 676; Bethlehem-Sparrows Point Shipyard v. Scherpenisse, 187 Md. 375, 50 A. 2d 256; Watts v. Delaware Coach Co., Del. Super., 58 A. 2d 689. It is the apparent view of the St. Louis Court of Appeals that our Act now affects the admissibility of hospital records. Russell v. Missouri Ins. Co., Mo. App., 232 S.W. 2d 812. This is also our view. In this connection we note that the term "business" as used in the Act includes "every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not." Section 490.670.

Our Act provides, "A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." Section 490.680.

Cases which we have examined are clear in ruling that the statutes making admissible records made in the regular course of business crystalize a rule which is an exception to the evidence-excluding hearsay rule. When the record entry is not of such a character as to give it

the status of a *business* entry, the entry is relegated **[670]** to the status of hearsay and is inadmissible under the hearsay rule. Green v. City of Cleveland, supra. ''In general, the admissibility, under such statutes, of hospital records in accident cases depends upon whether they relate to acts, transactions, occurrences, or events incident to the hospital treatment.'' 144 A.L.R. 727, at page 731.

In Sadjak v. Parker-Wolverine Co., supra, a workmen's compensation case, the hospital record entry that the deceased employee had ''fallen from a ladder'' was held not to be rendered admissible by the statute, since what the decedent told the hospital authorities did not refer to any ''act, transaction, occurrence, or event'' in hospital treatment.

In Watts v. Delaware Coach Co., supra, the defendant's motion for a new trial was granted after verdict for plaintiff in his action for personal injury allegedly sustained when the door of defendant's bus was closed on plaintiff's ankle, throwing plaintiff to the ground, twisting and breaking the ankle. Upon plaintiff's objection the Court had refused to admit into evidence the record of the hospital at which plaintiff had been treated. The part of the record excluded contained the words ''Patient states he twisted ankle while walking along street.'' (It is of import to notice that the initial italicized record entry in our case, as did the entry in the Watts case, purports to record *what the patient said.*) The precise question upon which the Court ruled in granting the new trial was ''whether a declaration against interest by a party to a case is admissible by way of a hospital record under circumstances where no witness was called to testify of his own memory that he heard the statement made.'' This is the precise question upon which we rule in the instant case. We are not herein considering the admissibility of a hospital record of a patient's self-serving declaration.

The Superior Court of Delaware was of the opinion the part of the record excluded—plaintiff's statement to the effect that he had twisted his ankle while walking along the street—was ''pathologically germane'' to the injury which necessitated his attendance at the hospital. It is reasonable to suppose that the words ''while walking along the street'' were sufficiently descriptive of the injury to aid the attending physician to some extent in diagnosing and treating the fracture. Consequently the record was of a statement made '' 'in the regular course' of (the hospital) business.'' It was so related to the injury involved as to facilitate prompt and intelligent diagnosis and treatment.

Consistently with the ruling of the Green case, a statement recorded by a railroad company of an employee's version of how an accident occurred, assuming the statement otherwise satisfied the provisions of the Act, was held inadmissible because such record was not one made in the regular course of the *railroad* business. Palmer v.

Hoffman, 318 U. S. 109, 63 S. Ct. 477, 144 A.L.R. 719, affirming 2 Cir., 129 F. 2d 976.

In Green v. City of Cleveland, supra, the plaintiff claimed defendant's streetcar was prematurely started and then suddenly stopped, causing plaintiff to fall to the street and to sustain injury. The reading into evidence of a hospital record containing the entry, "how happened: Fell off streetcar, caught heel," was held prejudicially erroneous. Paragraph One of the syllabus, concurred in by all members of the Supreme Court of Ohio, is as follows, "A hospital record, so far as it pertains to the cause of an accident resulting in injuries to a person causing his resort to a hospital, and not to the medical or surgical treatment of the patient in the hospital, is inadmissible in evidence as a business record within the purview of" the Ohio Act. The Court cited the Palmer and Sadjak cases to which we have referred; and Weis v. Weis, 147 Ohio St. 416, 72 N.E. 2d 245. The Court said it was the hospital's business to diagnose plaintiff's condition and treat her for her ailments, not to record a statement describing the cause of the accident in which she was injured.

We of course must agree with the view of the Supreme Court of Ohio that the entry in the hospital record in the Green case went to the "cause of the accident" [671] and did not record "observable" facts or events incident to the treatment of the patient in the hospital. But we have the opinion that the record entries in our case, which we have italicized supra, reflect the result of an inquiry helpful to an understanding of the medical or surgical aspects of the patient's hospitalization. We do not think that the entries admissible under the Act are invariably limited to "observable" (in the sense of being visual) facts or events incident to the treatment of the patient in the hospital. In our case the italicized entries do indicate, in a way, the "cause of the accident"; but, in our opinion, the entries also indicate *how plaintiff was injured.* We believe the record of the statement made by the patient (plaintiff) in the instant case, in so far as the statement recorded was relevant, and helpful to or of aid in the diagnosis and treatment of the patient's injury, was admissible under the Act.

The hospital wanted to know how the patient got hurt. This was helpful to the hospital because it aided in determining the nature and extent and proper treatment of the plaintiff's injury. The patient stated how he got hurt; the statement was recorded for the apparent purpose of furthering the hospital's business of determining the nature and extent and proper treatment of the injury; and the record of the statement was apparently made by some one of the hospital staff who presumably, in the circumstances of the recording, had no occasion to falsify the record. The record was surely of something—an act, condition or event—in the regular course of the hospital's business. In this connection, plaintiff-appellant also contends there was

no showing as to the mode or method of preparation of the City Hospital records; nor was there evidence as to time the record entries were made; nor was there evidence with respect to the sources of information.

When the record was read into evidence, plaintiff admitted such record was that of the City Hospital "and kept in the regular course of business," although, as stated, plaintiff was objecting to the parts of the record we have italicized on the ground of hearsay. It seems to us that plaintiff was not then further questioning the reliability of the records. Had plaintiff made known to the trial court that he was then further questioning the sources of information and the method and time of making the entries, the trial court should have determined whether in the trial court's opinion the sources of information, method and time of preparation were such as to justify its admission. The Act so contemplates. Section 490.680.

The first italicized record entry recites "*He* (the plaintiff, a patient just admitted for hospitalization) *states* that he walked into the front corner of a moving street car where the Hodiamont car line crosses Union Boulevard (quite near Union and Raymond)." Of course, the place where plaintiff was injured did not aid in an understanding of the patient's case from a medical standpoint, but admittedly plaintiff was injured at the place stated in the entry. The first entry also records that plaintiff was conscious and rational at a time approximately two hours after he was injured. This, of course, was observable by the person who made the record. The other italicized entries, if objectionable, were not prejudicial. Plaintiff did not testify that he was rendered unconscious. Three witnesses testified they conversed with plaintiff immediately or very soon after he was injured. Plaintiff testified only that he did not remember these circumstances, but he said he remembered his wife and one of the witnesses, a policeman, "coming to me," as he lay on the sidewalk after his injury. If it be assumed the information, "Patient was walking across the sidewalk - - - and either walked into the street car or it struck him," was given to the entrant by another than plaintiff, yet the admission of the entry into evidence could not be said to be prejudicially erroneous, inasmuch as plaintiff testified, in effect, that he was walking *across* the sidewalk. The effect of the equivocal or alternative clause of the entry—"either walked into street car or it struck him"—could not have been prejudicial. The prior entry had recited that *he stated* he had "walked into" a [672] moving streetcar, and the alternative—"or it struck him"—was the theory of plaintiff's case.

 (4) At defendant's request the trial court gave Instruction No. 4, which is as follows,

"The Court instructs the jury that you may not return a verdict for the plaintiff, Leonard Melton, under instruction No. One, if you find and believe from the evidence that the plaintiff walked

westwardly across Union Boulevard at a point far enough north of defendant's west-bound Hodiamont street car tracks so as to be out of the path of said west-bound street car, and not in danger of being struck thereby, and if you further find that after reaching the sidewalk on the west side of Union Boulevard, the plaintiff then turned and walked southwardly on said sidewalk and into the right side of defendant's said westbound street car, and if you so find, then your verdict must be against the plaintiff, and in favor of defendant.''

It is to be remembered plaintiff had testified that he was walking along twelve or eighteen inches north of the north rail of the north streetcar track; and in his humanitarian submission, Instruction No. 1, plaintiff hypothesized that he was *"walking westwardly across Union Avenue in the path of said street car,* and - - - that while plaintiff was so walking and after crossing the west curb - - - he became and was in a position of imminent peril - - - *that plaintiff was oblivious of his peril* - - - that defendant's operator saw or by the exercise of ordinary care on his part could have seen plaintiff in such position of imminent peril and oblivious thereof.'' (Our italics.) Obviously plaintiff's Instruction No. 1 submitted negligence under the humanitarian rule which was supported by plaintiff's own testimony, and the essential hypothesis of the plaintiff's instruction was his continuous movement across the boulevard in dangerous proximity to the track. This was plaintiff's theory by which and the factual basis upon which he was seeking to submit his obliviousness of danger and defendant's duty to act to avert a casualty upon reasonable appearance of plaintiff's obliviousness and imminent peril. Defendant's evidence, as we have said, was to the effect that plaintiff did not walk in dangerous proximity to the track, but crossed Union Boulevard north of and at a safe distance from the track, and had walked southwardly on the west sidewalk of Union and into the side of defendant's streetcar. The evidence introduced by defendant tended to show facts essentially different from plaintiff's version, and defendant's evidence, if believed, disproved plaintiff's version of the facts, and destroyed the foundation or support of the essential factual elements of plaintiff's humanitarian submission. Defendant's Instruction No. 4, applied to the conflicting factual versions of plaintiff and defendant in the instant case, hypothesized facts supported by defendant's evidence which negatived or disproved or destroyed the essential factual support of plaintiff's humanitarian rule submission. Although the defendant had the right to have a converse instruction hypothesizing the negative of the hypotheses of plaintiff's humanitarian instruction, defendant was not limited to negative instructions. Defendant was entitled to an instruction hypothesizing facts supported by defendant's evidence which disproved basic facts of plaintiff's humanitarian submission. Janssens v. Thompson, 360 Mo. 351,

228 S.W. 2d 743; Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S.W. 2d 562; Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S.W. 2d 742; Borgstede v. Waldbauer, 337 Mo. 1205, 88 S.W. 2d 373.

The judgment should be affirmed.

It is so ordered.

PER CURIAM.—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the Court en Banc. *Hyde, Hollingsworth, Leedy,* JJ., and *Ellison,* C.J., concur; *Tipton, J.,* concurs in result. *Conkling,* J., concurs in separate opinion. *Dalton,* J., dissents in separate opinion.

CONKLING, J. (concurring).—I concur in the principal opinion prepared by Judge Van Osdol. Hereinbelow I set out additional reasons for my concurrence in the view that plaintiff did not exercise ordinary care for his own safety and that he was contributorily negligent as a matter of law.

Plaintiff testified as follows:

''Q. Now, when you walked back south to the tracks, did you ever look east to see if there was any street car coming west there? A. I didn't turn east and look particularly for streetcars, no, sir.

Q. Did you, whether you looked particularly or not, did you look at all to see if a streetcar was coming? A. Yes, sir.

Q. Did you look east? A. Yes, sir. I didn't turn and look east, but facing south, if there had been a car along there, I would have seen that car.

Q. Do you remember in this deposition on August 18, 1950, being asked this question and giving this answer? Page 24:

'Q. Before you started walking across Union, 18 inches from the street car rail, did you look at your left or to the east to see. if there was any streetcar there? A. No, sir.'

Q. Do you remember being asked that question and making that answer? A. Yes, sir.

Q. And is that correct? A. I didn't look directly east, no.

\* \* \* \* \* \*

Q. Now, can you explain why you gave that answer if it is not correct? A. I did not look particularly for a streetcar, I looked for a reasonable amount of caution. I was walking south in the face of automobile traffic which was quite heavy, and you naturally have a certain amount of left-hand vision, or to the east when you are facing south. You put the question, did I look for a streetcar. I didn't look for a streetcar, I looked for anything that might be approaching that I might be in danger of.

Q. Was that answer correct? A. To a certain extent, yes, sir.

Q. Was it incorrect to a certain extent? A. Yes, sir.

Q. In what way was it incorrect? A. I didn't look for a streetcar, I did look to the left for anything that might be approaching,

but not particularly just to see if there was a streetcar coming. If there had been a streetcar within fifty or seventy-five feet, why, I would have seen it. ＊ ＊ ＊

Q. Do you remember this next question and next answer, immediately following the ones I just read to you, being asked and answered: 'Q. Well, am I correct in this: That at no time from the time that you got out of your car until the time that you were hit, did you look to the east to see if any streetcar was coming westwardly? A. No, sir, I didn't look. Q. You did not look at any time? A. No.' Do you remember those questions being asked and those answers being given by you? A. Yes, sir.

Q. Were they correct when given?

＊　　＊　　＊　　＊　　＊　.　＊

A. It still bears the thought that I didn't look particularly for a streetcar.

Q. Did you understand the questions at the time I asked them of you? A. I think I did.

Q. Did you understand this question, I am now reading the last one: 'Q. You did not look at any time? A. No.' Did you understand that question when you gave that answer? A. Yes, sir.

Q. From the time that you reached the point 12 or 18 inches north of the northern rail of the westbound tracks here, as you walked back to the tracks, and as you walked westwardly across the street, did you at any time, from the time you started walking westwardly by the tracks, look eastwardly to see if any streetcar was coming? A. No, [674] sir, when I turned my back to the east, I didn't look back.''

Thus plaintiff testified he never looked to the east to see if a street car was approaching. He merely said that ''if there had been a street car within 50 or 75 feet'' of Union that he would have seen it. But he did not look for any approaching street car. He did not even consider or think ''of the possibility of being struck by street car traffic'', and paid no attention to it whatever. Plaintiff knew that he was within 12 or 15 or 18 inches of the north rail and knew that street cars ran west on that track 24 hours a day. The very existence of the track near to which he knew he was walking was of itself a warning signal of danger. Not having looked ''particularly for street cars'', and not knowing whether one was approaching from the east, plaintiff turned his back upon his known source of danger and walked west across Union in the path of the overhang without giving thought to even ''the possibility of being struck''.

Under this record as I read it I do not see how it could be said that plaintiff gave any thought whatever to whether it was or was not safe to do what he did, or how it could be said that plaintiff

made any *assumptions* of any kind, reasonable or unreasonable, with respect to what might or might not happen. As noted in the principal opinion, and as conceded in the dissenting opinion, plaintiff just did not think at all (as shown by his own testimony) ''of the possibility of being struck by street car traffic''.

As I read the Missouri cases I believe the rule long adhered to is: that when a pedestrian takes a position on or so near to a street railway track that he will be struck by a passing street car, and in which position he is unable to even observe the approach of a street car, and when he knows the track is intermittently used by street cars, and when he neither looks nor listens for an approaching street car and gives no attention thereto, that such pedestrian is so contributorily negligent as a matter of law that he is barred from recovery upon any theory of primary negligence. Brockschmidt v. St. L. & M. R. R. Co., 205 Mo. 435, 103 S. W. 964, Davies v. Peoples Ry. Co., 159 Mo. 1, 59 S.W. 982, Young v. St. Louis Pub. Serv. Co., (Mo. App.) 57 S.W. (2d) 717, Thomas v. Wells, (Mo. App.) 299 S.W. 72, Strutman v. United Rys. Co., (Mo. App.) 238 S.W. 817.

I think the evidence in this case shows that, with indifference to his own safety, plaintiff, sui juris, voluntarily took a place he knew to be dangerous, that he thereupon engaged in such an undertaking (in walking west across Union in dangerous proximity to the north rail) as deprived him of any view or knowledge of any approaching car which might strike him, and that while walking west he made no effort to determine whether a street car was approaching from the east. I think his conduct barred his own recovery upon primary negligence.

■ DALTON, J. (dissenting).—We are unable to concur in that part of the opinion which holds that plaintiff was guilty of contributory negligence as a matter of law. The facts are well stated in the opinion. Defendant's tracks extend from east to west across Union Boulevard, a heavily traveled public street in the City of St. Louis. The opinion concedes that ''defendant's westbound streetcars stop at the east side of Union and proceed across the boulevard''; and that the testimony of defendant's operator shows that the streetcar in question did so stop on this occasion. ''Plaintiff was familiar with the intersection—had been there many times before.'' Further, ''he stated it was customary for pedestrians to use the streetcar tracks in crossing Union Boulevard at that point. The 'automobile traffic is heavy.' He walked ten or fifteen feet to within twelve or eighteen inches of the north rail of the westbound track. He saw no westbound street car. He then walked across Union twelve or eighteen inches north of the north rail of the north (westbound) track. * * * When he * * * started walk-

ing across Union, he did not turn to the left to 'look particularly to see' if there was any streetcar approaching from the eastward; but if there had been a streetcar 'within fifty or seventy-five feet, why, I would have seen it.' After he had started walking westwardly along the north (westbound) [675] track, and twelve or eighteen inches north of the north rail thereof, he 'didn't look back.' He walked along the track to be protected from automobile traffic. He did not think 'of the possibility of being struck by street car traffic.' ''

Taking a view of this evidence favorable to the plaintiff, the jury could find that, when plaintiff started west across this 60 foot street, there was no westbound streetcar within fifty to seventy-five feet of the east line of Union; that only a limited time would be required to cross the street; that plaintiff knew that if any streetcar approached from the east it would have to come to a full stop at the east side of Union and would have to start from a stopped position before crossing the street; and that the plaintiff would not reasonably have anticipated that he could not cross in safety and without looking behind him. Under such circumstances wouldn't an ordinary person assume that he could walk 60 feet in safety without looking behind him, wouldn't he assume that he would hear an approaching streetcar if one approached from the rear, and wouldn't he reasonably assume that, if he didn't hear it, no streetcar operator would start a streetcar from a stopped position and proceed across Union Boulevard behind him at such speed as to endanger him or strike before he could cross the 60 foot street? Such assumptions were reasonable ones, we believe, and particularly so where the streetcar tracks were customarily used by pedestrians in crossing the boulevard and where the operator would be on the lookout for pedestrians. The facts in evidence here make the situation very different from an ordinary railroad crossing over a public road or street.

Whether one is guilty of contributory negligence depends upon the particular facts and circumstances surrounding the occurrence that caused the injury. Graves v. Mo. Pac. R. Co., 342 Mo. 542, 118 S.W. (2d) 787, 791. In determining whether plaintiff was guilty of contributory negligence precluding a recovery for primary negligence on account of the injuries sustained, his act must be measured by the standard of whether an ordinarily prudent person under the same circumstances would have conducted himself in the same manner as plaintiff did. Negligence is not to be imputed to a person for failing to look out for a danger when, under the surrounding circumstances, the person sought to be charged with negligence had no reason to suspect that danger was to be apprehended. Willig v. C. B. & Q. R. Co., 345 Mo. 705, 137 S.W. (2d) 430, 436. As a general rule a person is not required to look for danger when he has no cause to anticipate danger

494

or when the danger is created by the negligence of another. Elgin v. Kroger Groc. & Baking Co., 357 Mo. 19, 206 S.W. (2d) 501, 507.

We think the issue of contributory negligence was for the jury and that the court erred in not submitting the issue of primary negligence.