IN RE APPLICATION OF LOUP RIVER PUBLIC POWER DISTRICT. JESSE B. HIGGINS, APPELLANT, v. LOUP RIVER PUBLIC POWER DISTRICT, APPELLEE.

68 N. W. 2d 170

Filed January 7, 1955. No. 33618.

*Carstens & Pickett, Perry & Perry,* and *W. W. Nuernberger,* for appellant.

*Walter, Albert & Leininger* and *Leslie H. Noble,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Appellant is the record owner of land west of and adjacent to the city of Beatrice. He and his wife reside upon and use the land. Appellee is a public corporation engaged in the generation and distribution of electric energy in this state. It instituted these proceedings to acquire by condemnation a perpetual easement across the land of appellant as a right-of-way for the construction, maintenance, and operation of a wood pole H structure X braced 115,000 volt, 3-phase transmission line. The land of appellant is about 232 acres and consists of the south half of the northeast quarter and the southeast quarter of Section 31, Township 4 North, Range 6 East of the 6th P. M. in Gage County, except 7.28 acres near the southeast corner of the north half of the southeast quarter and a small part off the southeast corner of the south half of the southeast quarter. The transmission line extends from the east line of the land a short distance south of the northeast corner of the southeast quarter to the south line thereof a short distance east of the southwest corner of the land. There are 5 two-pole and 1 three-pole structures. The distance between the poles of each structure is about 14½ feet. The clearance and safety features of the line comply with legal requirements. The distance between the structures varies from a minimum of 550 feet to a maximum of 711 feet. The easement affects land on which alfalfa and brome grass were growing at the time it was acquired and an area of timber and pasture land. The timber was cut and all obstructions were removed

from the easement. There was an appeal by appellant from the award of the appraisers in the condemnation proceedings to the district court. This is the second appeal in the case to this court. Higgins v. Loup River Public Power Dist., 157 Neb. 652, 61 N. W. 2d 213. There was a second trial in the district court. The verdict was that appellee did attempt to agree with appellant for an easement across his land, and that appellant was entitled to damages from appellee in the amount stated. The record does not show that a judgment was rendered or entered on the verdict. A motion for dismissal of the proceedings notwithstanding the verdict or in the alternative for a new trial was filed by appellant and it was denied in its entirety and in all of its alternatives. This appeal is from that order.

Condemnation is a special proceeding. The order complained of by appellant affects a substantial right. It is a final order. § 25-1902, R. R. S. 1943; Webber v. City of Scottsbluff, 155 Neb. 48, 50 N. W. 2d 533.

An issue in this case is whether or not appellee did in good faith before the commencement of the condemnation proceedings sufficiently attempt to contact and agree with appellant as to the price or amount of damages appellee should pay him for the easement appellee desired to acquire across the land of appellant upon which to construct, maintain, and operate an electric transmission line. Appellant pleaded that appellee had not made a good faith effort to do so. Appellee denied the assertions of appellant in this regard and alleged that before the commencement of the condemnation it made repeated efforts to contact, to negotiate, and to agree with appellant as to the amount it should pay him for the easement across his land for the use desired, but that appellant avoided appellee and refused it an opportunity to attempt to negotiate with him, and that by his conduct appellant established that any effort of appellee to agree with him on that subject would be futile and that

appellee was excused thereby from making further effort to do so. This was a legitimate and important issue in the case. The burden of proof concerning it was on appellee. Its failure to establish its assertions in reference thereto would be fatal to the case. Higgins v. Loup River Public Power Dist., *supra*. There was offered by appellee, received, read, and exhibited to the jury, over objections of appellant, as evidence to sustain the claim of appellee on this issue a document written and signed by Lusienski, the head of the right-of-way department of appellee who was incapacitated physically and mentally at the time of the trial. Appellant had no part in the making or knowledge of the document. It was made ex parte, dated May 17, 1950, and was found in a file of the department of appellee of which Lusienski had charge on that date. It was his habit to make writings of this nature and place them in the files of the right-of-way department though it does not appear that he was required or requested to do so.

The substance of the document referred to above is that Lusienski went to the home of appellant May 17, 1950, and met his wife at the back door, inquired of her if appellant was home, and was told " 'he was out in the field at work.' " Mrs. Higgins expressed dissatisfaction on account of publicity she and appellant had received in newspapers at Beatrice in connection with the injunction case against them brought by appellee in the district court for Gage County. Lusienski told her he did not know what she was talking about, but if the newspapers had published items about her and her husband they must have received their information from sources other than him and that he had no control over what the newspapers printed. The reply of Mrs. Higgins to Lusienski was " 'you should get better informed before you see Mr. Higgins.' " Lusienski again said he did not know what she was talking about. She then said "this was even a part of the papers that were served

on them by the sheriff." Lusienski then realized that she was making reference to a statement in his affidavit filed in the injunction case to the effect that Mrs. Higgins had told him that " 'her husband would positively not allow anyone on the premises and if anyone should attempt to do so, he would immediately be shot.' " Mrs. Higgins denied she made that statement to Lusienski, and said that the statement was untrue. He insisted that she had made the quoted statement to him three times in a conversation they had November 9, 1949. She then said she had no more time to talk to him and closed the door to the house.

Appellee attempts to justify the writing of May 17, 1950, as relevant and competent evidence by reference to the Uniform Business Records as Evidence Act. §§ 25-12,108 to 25-12,111, R. S. Supp., 1953. Appellee says the act defines "business" as any kind of business, profession, occupation, or operation of institutions. That procurement of right-of-way for contruction of transmission lines by it is a part of its business; that it is an occupation; and that it is a part of the operation of an institution because the district is an institution within the meaning of the act. That the instrument is a record of an act and event made in the regular course of business at or near the time of the act or event recorded, and that its custodian identified it and explained the mode of its preparation. Hence appellee concludes it "was obviously admissible in evidence under the Uniform Act."

The terms of the act are very comprehensive. "A record of an act, condition, or event, shall, insofar as relevant, be competent evidence * * *" if it is identified, "if it was made in the regular course of business" at or about the time of the thing recorded, and if the court is satisfied "the sources of information, method, and time of preparation were such as to justify its admission." § 25-12,109, R. S. Supp., 1953. The act does not make relevant that which is not relevant nor make all business

records competent evidence regardless of by whom, in what manner, and for what purpose they were compiled or offered. The act has the purpose of avoiding the rules of common law regarding the admissibility of business records as evidence and when a writing or record entry is not of such character as to give it the status of a business entry it is relegated to the status of hearsay and is inadmissible under the hearsay rule. Freedman v. Mutual Life Ins. Co,. 342 Pa. 404, 21 A. 2d 81, 135 A. L. R. 1249; Grogan v. Michael, 349 Pa. 369, 37 A. 2d 715; Ingram v. City of Pittsburgh, 346 Pa. 45, 29 A. 2d 32; Hancock v. Crouch (Mo. App.), 267 S. W. 2d 36; Melton v. St. Louis Public Service Co., 363 Mo. 474, 251 S. W. 2d 663.

An Act of Congress provided in substance that in any court of the United States any writing or record made as a memorandum or record of any act, transaction, occurrence, or event should be admissible as evidence thereof if it was the regular course of business to make such memorandum or record at the time of the event recorded or within a reasonable time thereafter. 49 Stat. 1561, c. 640, 28 U. S. C. A. (1940 ed.), § 695. In Palmer v. Hoffman, 318 U. S. 109, 63 S. Ct. 477, 87 L. Ed. 645, 144 A. L. R. 719, the court considered this Act of Congress in connection with an assignment that the trial court erred in excluding a statement in regard to a railroad crossing accident, made by the engineer who died before the trial of an action for damages on account of the alleged negligence of the railroad, and made 2 days after the accident pursuant to an established routine of the railroad company. The court found that the statement satisfied all of the requirements of the act except it was not made in regular course of business. It was observed that the fact that the railroad company made a business of recording its employees' statements of their versions of their accidents did not put those statements in the class of records made in the regular course of the business within the meaning of the act; and that

the phrase regular course of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business. In the opinion the court said: "We may assume that if the statement was made 'in the regular course' of business, it would satisfy the other provisions of the Act. But we do not think it was made 'in the regular course' of business within the meaning of the Act. The business of the petitioners is the railroad business. That business like other enterprises entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation. * * * The engineer's statement which was held inadmissible in this case falls into quite a different category. It is not a record made for a systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy. Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. * * * We cannot so completely empty the words of the Act of their historic meaning. If the Act is to be extended to

apply not only to a 'regular course' of a business but also to any 'regular course' of conduct which may have some relationship to business, Congress not this Court must extend it. Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication. * * * In short, it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like, these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading." See, also, New York Life Ins. Co. v. Taylor, 147 F. 2d 297.

Appellee has not suggested any purpose the writing of Lusienski received in evidence could have served appellee other than the use attempted to be made of it in this litigation. It is difficult to think of any other use that it could have had. The Ohio court in speaking of the Uniform Business Records as Evidence Act in the case of Weis v. Weis, 147 Ohio St. 416, 72 N. E. 2d 245, 169 A. L. R. 668, said: "Of course, if it should appear that such records have been made and kept solely for a self-serving purpose of the party offering them in evidence, it would be the duty of a trial court to refuse to admit them."

The purpose of the act is to permit admission of systematically entered records without the necessity of identifying, locating, and producing as witnesses the individuals who made entries in the records in the regular course of the business rather than to make a fundamental change in the established principles of the shopbook exception to the hearsay rule. New York Life Ins. Co. v. Taylor, *supra;* Ettelson v. Metropolitan Life Ins. Co., 164 F. 2d 660; Clainos v. United States, 163 F. 2d 593; Palmer v. Hoffman, *supra;* Loper v. Morrison, 23 Cal. 2d 600, 145 P. 2d 1; Weis v. Weis, *supra.* In Clainos v. United States, *supra,* the court said: "The Rule contemplates that certain events are regularly recorded as

'routine reflections of the day to day operations of a business' so that 'the character of the records and their earmarks of reliability' import trustworthiness. Thus, the recordation becomes a reliable recitation of the fact. The preparation and maintenance of notations of events outside the operation of the business are not the recordation contemplated."

The document dated May 17, 1950, written by Lusienski and offered by appellee was hearsay and self-serving. It was not admissible as evidence against appellant under any rule of evidence. The objections of appellant to its introduction in evidence should have been sustained. The error in permitting it to become evidence was intensified by the instruction of the court that in deciding whether appellee had made a good faith effort to negotiate with appellant for the easement across his land the jury should take into consideration the words and acts of Mrs. Higgins, wife of appellant. This document is the only disclosure by the record of any words or acts of the wife of appellant. In Borden v. General Ins. Co., 157 Neb. 98, 59 N. W. 2d 141, it is said: "Proof in the trial of a jury case should be confined to legal evidence which tends to prove or disprove the issues made by the pleadings. Evidence erroneously received in such a case may not be considered without prejudice against whom it is admitted if it may have influenced the result as to him. If it does not appear from an examination of the record that the evidence wrongfully received did not affect the result of the trial its reception must be considered prejudicial error." A consideration of the record prevents a conclusion that the jury was not influenced by the improperly admitted writing. There is no way to determine that the jury did not decide this issue against the appellant on the hearsay, incompetent, and self-serving contents of this document. It could be that it did because of the statement therein that Mrs. Higgins had thrice stated that " 'her husband would positively not allow anyone

on the premises and if anyone should attempt to do so, he would immediately be shot.' " The writing was a material part of the matters offered by appellee intended to establish that it had made a good faith effort to negotiate with appellant for the easement.

There was testimony of the following matters intended to sustain a finding that appellee had satisfied the requirements that before it resorted to condemnation it must try in good faith to agree with the owner of the land concerning the rights sought in or over it: The first act towards securing the right-of-way across private property for a new power transmission line is usually to obtain consent of the owner of the property for a survey to determine and locate the route of the line. The location of structures to support it cannot be selected until a survey is made. It is impossible to negotiate for purchase of a right-of-way for such a construction until a survey has been had because only thereby can it be determined where the line will be located; the sites of the structures; what obstructions, such as trees, will have to be removed for safe clearance of the line when constructed; and whether guy wires will be required, and if so how many and the area that will be affected by them.

An employee of appellee, Christensen, a member of the right-of-way department who worked generally in the field, hereafter identified as the employee, on August 29, 1949, went to the farm of appellant for the single purpose of securing permission of the owner to make a survey across the land. He was not authorized to negotiate for a right-of-way and he could not then have made to the owner an offer of any amount for an easement across the land. The employee saw and talked with the appellant at his residence on the land. The employee stated that he was acting for appellee; that it was necessary for it to build a transmission line from Beatrice towards Hebron and extending to Hastings; and he asked appellant if he would "permit us to make

a survey." His answer was that he was not going to have a transmission line on his farm; that there would be no survey thereon; and if he saw surveyors on his land "you will find them there tomorrow."

In the latter part of 1949 the employee and two other men, supplied with surveying equipment, went to the farm of appellant. They did not see or contact appellant or his wife. They saw and talked with the son of appellant. The three men presented themselves as members of a surveying party for appellee. Soon after they arrived at the farm Vasey, a lawyer from Beatrice, came where they were, stated that he represented appellant, and suggested that they have a conference at his office. They went there and were joined by Noble, an attorney for appellee. There was a discussion concerning the survey and it was agreed that appellee could make the desired survey on the land of appellant; that a pending injunction suit to prevent appellant from interfering with appellee making the survey would be dismissed; and that appellee would pay appellant $25 damages caused by the survey and as an incidence of the disposition of the injunction case. These things were done. The survey was made that day. Later the $25 was paid to Vasey and the injunction suit was discontinued.

The employee and Lusienski, the head of the right-of-way department, went to the farm of appellant May 17, 1950. Lusienski and the wife of appellant met and talked. The employee remained in the automobile. He did not hear any conversation between them. Lusienski and the employee did not see appellant on that occasion. They drove on the highway on the east and south of the farm of appellant but they made no other effort to locate him. The employee knew as early as the latter part of 1949, that Vasey represented appellant. He did not know that the relationship between them was altered in any respect before the condemnation proceedings were commenced. The employee was present during

the negotiations successfully conducted by virtue of which permission was secured to make a survey on the land. When he and Lusienski made the trip from Columbus to Beatrice and the farm of appellant May 17, 1950, they made no effort to contact Vasey or to negotiate with or through him for securing the right-of-way by agreement. The employee said that he acted for the right-of-way department in buying right-of-way; and that he knew how to compute and arrive at the amount that should be paid by the district. He was in Beatrice and made payment of the $25 referred to above by check to Vasey on February 15, 1950. He made no effort to negotiate with Vasey at that time concerning the right-of-way across the land of appellant. Neither did he attempt to contact and negotiate with appellant through Vasey. He said nothing about wanting to pay for the easement at that time. Appellee after the survey was completed in August 1949, until the condemnation was commenced in February 1951, did not contact or make reasonable effort to contact appellant or to negotiate with him concerning the payment of a price or damages for the right-of-way upon and across his land. There was no offer of payment made in any manner by appellee to appellant for the easement.

Appellant has owned, lived upon, and farmed the land involved herein located immediately west of the city of Beatrice since 1917. It is a fair inference from the record that it would not have been too difficult to locate and contact him at any time important to this matter. There were ways of satisfying the requirement of attempting to agree before condemnation was available other than personal contact and verbal conversation of the parties. There was no attempt to make use of any of them. It may in this connection be appropriately recalled that the original position of appellee in this matter was that it was not necessary for it to attempt to agree with appellant concerning the easement across his land. It was

maintained by the district that whether it had or had not was not an issuable matter in the litigation and it persisted in this view until its validity was disapproved by this court. The record fails to disclose any disposition of appellee to pay appellant any amount for the burden it desired to place and has placed upon his land. As late as the second trial in the district court all evidence offered by appellee on the issue of damage was that the market value of the land of appellant was exactly the same after the transmission line was constructed as it was before it was built, and that appellant had not thereby been damaged in any amount. This appears to have been a true reflection of the attitude of the appellee throughout this matter. It was able to secure permission to go upon the land and make a survey by negotiation with appellant through his counsel. Likewise the parties were able to resolve a disagreement concerning the entering upon the land of appellant to leave poles and equipment thereon preparatory to construction. There was no like attempt to agree by the same means relative to the easement and compensation for it. The evidence is inadequate to support a finding that the requirement in this regard as stated in the first appeal has been satisfied. In Higgins v. Loup River Public Power Dist., *supra*, it is said: "Where a statute requires that an attempt to agree with the owner shall first be made before the institution of condemnation proceedings to take private lands for public use, such provision is mandatory, and condemnation proceedings instituted without first making a bona fide attempt to agree with the owner are subject to direct attack. * * * The attempt and failure to agree must be alleged and proved, and this must appear on the face of the record."

The denial of the motion of appellant for dismissal of the case should be and it is affirmed. The action of the district court overruling the motion of appellant for a new trial was incorrect and it should be and it is re-

versed, and the cause is remanded to the district court with directions to sustain the motion for a new trial and for further proceedings in harmony with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

CHAPPELL, J., participating on briefs.