one element of a cause of action for breach of fiduciary duty, there is nothing inconsistent in the trial court's findings.

## VI. CONCLUSION

We conclude that the trial court did not err in finding that the property was sold at or near fair market value and that therefore, the appellants suffered no damages. Additionally, the court did not err in discounting the offer from BDG; nor was it error for the court to decline to impose any equitable remedies. Although we find no abuse of discretion in denying each party attorney fees after trial, we vacate the orders granting interim attorney fees and remand the matter to the trial court for a determination of whether justice and equity require the trust to bear these costs.

Affirmed in part, and in part vacated
and remanded with directions.

John Camden and Mary Camden, appellees,
v. Papio-Missouri River Natural
Resources District, appellant.
___ N.W.2d ___

Filed August 26, 2014.    Nos. A-13-266 through A-13-268.

1. **Eminent Domain: Appeal and Error.** An appeal from the district court's determination that good faith negotiations occurred prior to the filing of a condemnation petition presents a mixed question of law and fact.
2. **Eminent Domain: Jurisdiction.** Statutory provisions requiring good faith attempts to agree prior to institution of condemnation proceedings are jurisdictional, and objection based on the failure of the record to show that the parties cannot agree may be raised at any time by direct attack.
3. **Jurisdiction: Appeal and Error.** The question of jurisdiction is a question of law, which an appellate court resolves independently of the trial court.
4. **Actions: Eminent Domain: Courts.** Pursuant to Neb. Rev. Stat. § 76-704 (Reissue 2009), if any condemnee fails to agree with the condemnor with respect to the acquisition of property sought by the condemnor, a petition to condemn the property may be filed by the condemnor in the county court of the county where the property or some part thereof is situated.
5. **Eminent Domain.** In order to satisfy Neb. Rev. Stat. § 76-704.01(6) (Reissue 2009), there must be a good faith attempt to agree, consisting of an offer made in good faith and a reasonable effort to induce the owner to accept it.

6. **Words and Phrases.** Good faith is a state of mind consisting of honesty in belief or purpose and the absence of intent to defraud.

7. **Eminent Domain.** Extended negotiations are not required if the condemnor and condemnee cannot reach an agreement.

8. **Eminent Domain: Jurisdiction.** The statutory requirement that a condemnor make a good faith offer and reasonably attempt to induce settlement is mandatory and jurisdictional.

9. **Eminent Domain: Proof: Records.** A condemnor's unsuccessful attempt to reach an agreement with the condemnee must be alleged and proved in the condemnation proceedings and must appear on the face of the record.

Appeal from the District Court for Washington County, JOHN E. SAMSON, Judge, on appeal thereto from the County Court for Washington County, C. MATTHEW SAMUELSON, Judge. Judgment of District Court affirmed.

Paul F. Peters for appellant.

Wm. Oliver Jenkins and Benjamin M. Belmont, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellees.

MOORE, PIRTLE, and RIEDMANN, Judges.

MOORE, Judge.

In this condemnation proceeding, the Papio-Missouri River Natural Resources District (NRD) appeals from a decree of dismissal entered by the district court for Washington County. The district court concluded that the NRD failed to show that it made a reasonable attempt to induce John Camden and Mary Camden to accept its offer to acquire an easement, which attempt is a jurisdictional requirement to a condemnation proceeding. After our review of the record, we agree with the district court and affirm.

## FACTUAL BACKGROUND

The NRD is the owner and operator of approximately 85 dams and 100 miles of levees. In 1983, the NRD constructed a dam, designated as "W-3," to heal an eroding gully and stabilize a stream in Washington County. This was a joint project with the National Resources Conservation Service of the U.S. Department of Agriculture (USDA) under the USDA's "Public Law 566" program. In April 1982, the owners of the land on which the dam was to be constructed granted

the NRD an easement to allow the NRD to build, operate, and maintain the damsite. John's construction and excavation company was hired to construct this dam. The dam was initially constructed as a low-hazard dam with an expected lifespan of 50 years.

In November 1993, the Camdens purchased real property that included the damsite. While owner of this property, John constructed a number of features near the damsite which enabled him to harvest topsoil. According to John, he harvested this soil for over 20 years.

In approximately 2005, the Camdens learned that the NRD was considering rehabilitating the W-3 damsite. The Camdens were initially included in discussions with the NRD regarding the potential design of the site's structure. In 2008, following an environmental assessment, the NRD elected to upgrade the W-3 dam to a high-hazard dam. The NRD had an opportunity to receive federal stimulus funding for the rehabilitation of the dam, and the project was placed on "fast track" status to meet the federal deadlines.

Martin Cleveland, a construction engineer for the NRD, was the NRD representative responsible for acquiring the landrights needed for the dam upgrade. A public hearing was held in May 2009 during which the need for the project and the impact on associated landowners were discussed. John and his attorney attended and spoke at the hearing in opposition to the project. Following the hearing, legal descriptions were developed for the easements needed to complete the project and an appraisal of the impacted property was commissioned. The NRD sought to acquire a permanent easement around the original easement area and a temporary easement for ingress and egress during construction. The area of the permanent easement sought totaled approximately 11.23 acres.

An appraisal of the impacted property was completed, and in the appraiser's summary report, dated May 28, 2009, he concluded that the value of the NRD's proposed permanent easement and temporary construction easement on the property was $67,350. On June 15, Cleveland sent a letter on behalf of the NRD to the Camdens that included a proposed purchase agreement and proposed easements. The NRD offered the

Camdens $67,350 in exchange for the easements. Cleveland spoke with John by telephone sometime after the letter was sent, to ensure the Camdens had received the NRD's offer. During that conversation, John directed the NRD to send all future correspondence to the Camdens' attorney.

In early July 2009, Cleveland spoke with the Camdens' attorney and informed him that a revised purchase agreement and easement agreement would be sent. On July 30, Cleveland sent the Camdens' attorney a letter containing revised purchase and easement agreements. Cleveland's letter indicated the NRD had not adjusted the amount of its offer, but had clarified easement rights and corrected previous errors in the purchase agreement and easement documents. Cleveland testified that the NRD had lowered the elevation requirement for the flood pool, which lowering would allow the Camdens to use more of the permanent easement area for farming and other activities. The NRD requested a written response to the offer on or before August 10, 2009.

On August 4, 2009, the Camdens' attorney sent Cleveland a letter rejecting the NRD's offer. Through this letter, the Camdens communicated that their loss of land was valued at $750,000 because they would lose their ability to harvest soil. The Camdens also proposed an alternative that would mitigate their loss. This alternative, or counteroffer, consisted of the following five parts:

> 1. The present auxiliary/emergency spillway would remain to the North, but would be moved 100 feet to the South to enable access to [the Camdens'] proposed building site. The present alignment to stay as is to eliminate westerly dogleg on south end of structure. In addition, no dirt to be taken from Camden property to build the new structure.
>
> 2. The easement would set forth that the grantee would permanently maintain the conservation pool at the draw down elevation of 1,226 feet to allow Grantor to continue to harvest the silt dirt as will be designated on the plans.
>
> 3. Camden Excavating would supply the dirt for this project at its fair market value; in addition, Camden

Excavating would not be disqualified from bidding or constructing this project.

4. The Camdens would receive $150,000.00 in compensation for this permanent easement, plus $5,000.00 in attorney fees.

5. Any damages sustained to the crops on the land would be directly reimbursed to the individual renting the land.

The Camdens' attorney requested that Cleveland contact him if he wanted to meet to review the Camdens' response.

On August 6, 2009, Cleveland responded to the Camdens' counteroffer with another letter. Cleveland notified the Camdens that their counteroffer would be presented to the NRD's board of directors (the Board) at the upcoming meeting on August 13 and invited the Camdens to make a presentation during that meeting. However, Cleveland also informed the Camdens that NRD management was not recommending that the Board accept the counteroffer. Specifically, Cleveland noted that NRD management viewed the counteroffer as "being unreasonable and/or disruptive of the project, and irrelevant to the real issue of the amount of the diminution in the fair market value of [the Camdens'] property resulting from acquisition of the easements."

At the August 13, 2009, meeting, John was allowed to briefly speak in front of the Board before being told to sit down. One of the Board members testified that the Camdens' proposal document was not physically presented at the subsequent closed session of the meeting. Nor, he testifed, was the Camdens' counteroffer completely explained to the Board; instead, NRD management only informed the Board that the Camdens "gave a frivolous offer." At the conclusion of the meeting, the Board adopted the condemnation resolution. No actual response to the Camdens' counteroffer was given by the NRD, and no further effort was made to negotiate an agreement with the Camdens prior to commencement of the condemnation proceedings.

The NRD filed a "Petition for Appointment of Appraisers" on August 14, 2009. On September 19, the report of the appraisers was filed in the county court and the Camdens were

awarded a total of $113,416. The Camdens appealed that award to the district court.

On October 13, 2009, the NRD filed a "Petition for Appointment of Appraisers for Corrected Easement" because an error was discovered in the legal description of the temporary ingress and egress easement. The Camdens were awarded an additional $600 for the corrected easement. That award was also appealed to the district court.

On February 16, 2010, after another error was discovered, the NRD filed a second "Petition for Appointment of Appraisers for Corrected Easement." That petition sought to correct the description of the temporary ingress and egress easement. Once again, the Camdens were awarded $600 in damages. That award, which was in addition to the above $600 award, was also appealed to the district court.

In their petitions on appeal to the district court, the Camdens raised a number of claims which they argued should invalidate the NRD's condemnation proceedings. Among these claims was that the NRD did not negotiate in good faith prior to initiating the condemnation process. The district court consolidated all three of the condemnation cases and held a bench trial on this issue on January 28, 2013.

On February 11, 2013, the district court entered an order of dismissal of all condemnation proceedings. The district court found that the NRD was under pressure to complete the project as quickly as possible to avoid losing federal stimulus funds. It found that because of this pressure, the NRD made a number of errors during the process, including having to initiate three separate condemnation proceedings in order to address legal description discrepancies. The court also concluded that the NRD did not negotiate in good faith, because it did not make a reasonable attempt to induce the Camdens to accept the offer.

In so holding, the district court found that the Camdens' counteroffer was not frivolous, unreasonable, or disruptive, for two reasons: First, the court noted the NRD made unilateral design-change plans in between its offers to the Camdens which could have signified to the Camdens that changes to the plan were still a subject of negotiation. Second, the court

noted the Camdens' $150,000 counteroffer was closer to the board of appraisers' award than the $67,350 offered by the NRD. The district court dismissed the proceedings due to a lack of jurisdiction.

The NRD appeals from the order of dismissal.

## ASSIGNMENTS OF ERROR

Although assigning three separate errors, the NRD essentially argues that the district court erred when it determined that the NRD did not make a reasonable attempt to induce the Camdens to accept its offer and dismissed the action.

## STANDARD OF REVIEW

[1-3] An appeal from the district court's determination that good faith negotiations occurred prior to the filing of a condemnation petition presents a mixed question of law and fact. *Krupicka v. Village of Dorchester*, 19 Neb. App. 242, 804 N.W.2d 37 (2011). Statutory provisions requiring good faith attempts to agree prior to institution of condemnation proceedings are jurisdictional, and objection based on the failure of the record to show that the parties cannot agree may be raised at any time by direct attack. *Id*. The question of jurisdiction is a question of law, which an appellate court resolves independently of the trial court. *Id*. However, findings as to any underlying factual disputes will be upheld unless clearly erroneous. *Id*.

## ANALYSIS

The NRD contends that it met the statutory requirement to engage in good faith negotiations prior to initiating condemnation proceedings. The NRD provides three arguments to support its position. First, the NRD contends that it made substantial changes to its design of the rehabilitated dam in order to induce the Camdens to accept. Second, the NRD's invitation to the Camdens to present before the August 2009 meeting of the Board should have been considered an attempt to induce the Camdens' acceptance. Finally, the NRD asserts that the Camdens' counteroffer was so unreasonable and excessive that it excused the NRD from any further negotiation.

[4] Before addressing the NRD's arguments, we summarize the underlying law. Under Neb. Rev. Stat. § 76-704 (Reissue 2009),

> [i]f any condemnee shall fail to agree with the condemn[o]r with respect to the acquisition of property sought by the condemn[o]r, a petition to condemn the property may be filed by the condemn[o]r in the county court of the county where the property or some part thereof is situated.

The petition shall include, among other things, evidence of attempts to negotiate in good faith with the property owner. Neb. Rev. Stat. § 76-704.01(6) (Reissue 2009).

[5-7] In order to satisfy § 76-704.01(6), there must be a good faith attempt to agree, consisting of an offer made in good faith and a reasonable effort to induce the owner to accept it. See *State v. Mahloch*, 174 Neb. 190, 116 N.W.2d 305 (1962). This court has defined good faith as "a state of mind consisting of honesty in belief or purpose and the absence of intent to defraud." *Krupicka v. Village of Dorchester*, 19 Neb. App. at 256, 804 N.W.2d at 48, citing Black's Law Dictionary 762 (9th ed. 2009). The Nebraska Supreme Court has stated that extended negotiations are not required if the condemnor and condemnee cannot reach an agreement. *State v. Mahloch, supra*.

[8,9] The statutory requirement that a condemnor make a good faith offer and reasonably attempt to induce settlement is mandatory and jurisdictional. *Prairie View Tel. Co. v. County of Cherry*, 179 Neb. 382, 138 N.W.2d 468 (1965); *Higgins v. Loup River Public Power Dist.*, 157 Neb. 652, 61 N.W.2d 213 (1953). The condemnor's unsuccessful attempt to reach an agreement with the condemnee must be alleged and proved in the condemnation proceedings and must appear on the face of the record. See *Prairie View Tel. Co. v. County of Cherry, supra*. The Nebraska Supreme Court has analyzed this negotiation requirement in a number of cases, which we summarize below.

In *Higgins v. Loup River Public Power Dist.*, 159 Neb. 549, 68 N.W.2d 170 (1955), a public power district brought

condemnation proceedings against the owner of a farm in order to obtain an easement across the farm for an electric transmission line. The owner of the farm first refused to allow the district to complete a survey of the proposed easement, but eventually an agreement to complete the survey was reached with the help of the owner's attorney. However, after this survey, the district did not further negotiate with the owner or his attorney before instituting condemnation proceedings. Rejecting the district's arguments that it was not able to contact the owner, the court determined that the district did not meet its statutory requirement to negotiate in good faith.

In *State v. Mahloch, supra*, the State sought to obtain lands to be used as a right-of-way for an interstate highway. The State informed the landowner that it wished to purchase a portion of his land and offered $16,600 based upon an appraisal completed by the Department of Roads. The landowner declined the offer. The State then sent the landowner a letter describing the first meeting and reoffered the $16,600 as a final offer. Contracts for sale were included with the letter. The landowner did not respond to the letter or make any further effort to negotiate. The trial court found the State's offer was sufficient. On appeal, the Nebraska Supreme Court affirmed, finding that the State had met its duty to make a good faith offer to purchase and a reasonable bona fide attempt to have the offer accepted.

In *Wolfe v. State*, 179 Neb. 189, 137 N.W.2d 721 (1965), the State brought eminent domain proceedings to obtain a permanent easement for state control of outside advertising on an owner's land located next to a highway. Before initiating those proceedings, the State offered the landowner $25 for the easement. The landowner replied that he would not grant the easement for less than $7,000 or $8,000. The State then sent a letter confirming the $25 offer and advised that it could be accepted at any time prior to the condemnation hearings. The trial court found that the State made an offer in good faith. The Supreme Court affirmed, noting that the nominal offer was supported by the evidence at trial that the value of the landowner's property was the same after the taking as it was before the taking.

In *Prairie View Tel. Co. v. County of Cherry*, 179 Neb. 382, 138 N.W.2d 468 (1965), Cherry County, Nebraska, sought to condemn real estate for a county road. The county requested that the landowners attend a meeting before its board of commissioners in order to engage in negotiations. When the landowners did not attend the meeting, the county attempted one visit to their home to discuss acquiring the property, but did not find the landowners at home. The county then sent the landowners a letter offering $3,000 and requiring their attendance at a board of commissioners meeting to discuss the offer. The county's letter stated that if the landowners did not attend the meeting or otherwise inform the board, the board would conclude they refused to accept the offer and refused to further negotiate. However, the letter did not indicate the extent of the lands the county was seeking. During the condemnation proceedings, the landowners filed a motion for summary judgment contending that the county did not make a good faith offer and a reasonable attempt to induce them to accept the offer. The district court granted the motion and dismissed the county's condemnation proceedings. The district court held that there was no offer made in good faith because the county never informed the appellees as to the amount of land it intended to take. The Supreme Court agreed with the district court's holding and affirmed.

Finally, in *Suhr v. City of Seward*, 201 Neb. 51, 266 N.W.2d 190 (1978), the Nebraska Supreme Court concluded the City of Seward, Nebraska, had engaged in good faith negotiations with landowners before instituting condemnation proceedings to obtain a clear zone easement over a 2.32-acre parcel of the landowners' property for airport purposes. In that case, the city employed two appraisers, who estimated the landowners' damages at $1,200 and $1,600. A review appraiser concluded the initial estimates were excessive and valued the landowners' damages at $500. The city contacted the landowners and presented a written offer of $500 for the easement. When the landowners responded that the initial offer was inadequate, the city indicated that it would consider a counteroffer. The landowners did not make any counteroffer or raise any questions regarding the easement. Instead, the landowners contacted

an attorney who wrote to the city and informed the city that the landowners would not negotiate regarding the easement because the city's airport project violated county zoning ordinances. This allegation regarding violation of zoning ordinances was rejected by the Nebraska Supreme Court in another case. See *Seward County Board of Commissioners v. City of Seward*, 196 Neb. 266, 242 N.W.2d 849 (1976). Citing *Wolfe v. State*, 179 Neb. 189, 137 N.W.2d 721 (1965), and a number of decisions from other jurisdictions, the *Suhr* court found the letter from the landowners' attorney excused the city from any further attempts to negotiate.

In addition to the Nebraska Supreme Court's decisions regarding the negotiation requirement, this court has also recently confronted this requirement. In *Krupicka v. Village of Dorchester*, 19 Neb. App. 242, 804 N.W.2d 37 (2011), the landowner contended that the Village of Dorchester, Nebraska, never presented a valid offer because it did not include a legal description of the land to be condemned. Distinguishing our case from *Prairie View Tel. Co. v. County of Cherry*, 179 Neb. 382, 138 N.W.2d 468 (1965), we determined the village sufficiently described the land it was attempting to acquire in its offer. Thus, we concluded the village had engaged in good faith negotiations.

Applying the above statutory requirement and the corresponding case law to the present matter, we conclude the NRD failed to meet the requirement of making a reasonable attempt to induce the Camdens to accept its offer prior to initiating condemnation proceedings.

We conclude, as did the district court, that the NRD's offer to the Camdens occurred on July 30, 2009. The NRD's arguments that it made earlier design changes to the rehabilitation project in order to induce the Camdens to accept the offer are not convincing. Although the NRD did include the Camdens in initial discussions regarding the dam rehabilitation while the environmental impact was studied, at no time did the NRD convey to the Camdens that it was negotiating for easements on their property. Further, these discussions occurred before the Camdens were aware of the exact extent of the NRD's taking. Additionally, the NRD never conveyed to the

Camdens that it was changing the elevation of the spillway as part of the negotiations. Rather, the NRD stated that revisions to the offer were being made and a revised offer would be sent at some point. There is no evidence in the record that the Camdens were aware the NRD was lowering the spillway as part of the negotiations. Rather, the NRD made this change unilaterally.

We also reject the NRD's claim that affording the Camdens an opportunity to present at the August 2009 meeting of the Board was a reasonable attempt to induce acceptance of the offer. The record shows that John had a brief opportunity to address the Board before and after the Board went into a closed executive session. There is no evidence in the record that the Board gave a formal response to the Camdens' counteroffer, presented another offer in response to the Camdens' counteroffer, or even retendered its original offer during that meeting. In fact, the only evidence in the record regarding this meeting demonstrates that the Board was simply informed during its executive session that the Camdens' counteroffer was frivolous.

Finally, having independently analyzed the Camdens' counteroffer, we cannot say the district court erred when it found the counteroffer was not unreasonable to the degree that would have excused the NRD from further negotiations. When the Camdens made their counteroffer, it was in response to the NRD's revised offer which incorporated a design change in the spillway. The NRD never informed the Camdens that additional changes to the project could not be accommodated. Thus, the Camdens' proposals for design changes were not unreasonable.

Additionally, the Camdens' request for $150,000 in compensation and $5,000 in attorney fees was not irrational. This is especially true considering the fact that the board of appraisers concluded that the Camdens should be awarded $113,416 in damages resulting from the taking. The NRD's offer, $67,350, was approximately half of this amount.

To avoid this entire situation, the NRD simply had to respond to the Camdens' counteroffer and explain that it was adhering to its original offer. See *Wolfe v. State*, 179 Neb. 189,

137 N.W.2d 721 (1965). It failed to do so. The NRD's arguments that it negotiated in good faith are without merit.

## CONCLUSION

We affirm the district court's conclusion that the NRD failed to show that it made a reasonable attempt to induce the Camdens to accept its offer to acquire an easement.

AFFIRMED.